Becker v. State







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


)
CHARLES GONZALEZ,                                 )                  No. 08-04-00057-CR
)
                                    Appellant,                        )                              Appeal from
)
v.                                                                          )                  168th District Court
)
THE STATE OF TEXAS,                                   )                  of El Paso County, Texas
)
                                    Appellee.                          )                  (TC# 20020D06358)


O P I N I O N


            Charles Gonzalez appeals his conviction of capital murder. A jury found Appellant guilty,
and the trial court assessed an automatic life sentence as the State did not seek the death penalty. 
Because we conclude that a change of venue was required, we reverse and remand for a new trial.
FACTUAL SUMMARY
            In October of 2002, Appellant lived in the home of his friend, Joshua Moss, in Chaparral,
New Mexico. One evening, Appellant and Moss smoked marihuana while watching movies and
playing video games. Another friend, A.C.,


 joined them and brought cocaine with him. The three
of them smoked all of the cocaine, approximately .3 grams. They purchased more and smoked it as
well. During the course of the evening, they made several more trips to purchase cocaine, but
eventually ran out of money. They were discussing various options to get money when A.C.
suggested they rob a Good Times Store located in El Paso County. The others agreed and began
developing a plan. They decided that Moss would drive, and A.C. and Appellant would rob the store. 
Appellant said that they needed to take a weapon in order to scare the victim, and Moss specifically
brought up the idea of using a gun. A.C. said that he had a gun at his house and told the others that
if they take it, they “can’t hesitate to use it.” Upon hearing this, Moss backed out because he was
afraid A.C. would use the gun. Moss tried to convince the others that they should “rob a house”
instead because there would not be any cameras and no possibility of anyone getting hurt. He tried
to dissuade both A.C. and Appellant from committing the robbery, telling them that “no one gets
away with it” but neither would listen. A.C. and Appellant left Moss’s house at about 1:30 a.m. in
A.C.’s car. 
            Charles Potts, a decorated Viet Nam veteran, had worked for the Good Times Store in
northeast El Paso for four years and he typically worked the “graveyard shift” from 10:30 p.m. until
6:15 the following morning. During this shift, Potts worked alone in the store. Because the store
is equipped with video surveillance cameras, the offense committed by Appellant and A.C. was tape
recorded. That recording depicts Appellant and A.C., who was armed with a rifle, entering the store
during the early morning hours of October 29, 2002. Their faces were partially covered by bandanas
which Moss had given them. While pointing the rifle at Potts’ chest, A.C. demanded that Potts give
him the money and Appellant added, “everything.” When Potts asked whether they wanted the ones
too, Appellant again replied, “everything.” After Appellant took the money from Potts, A.C. fired
a single shot at Potts’ chest, killing him. 
            Appellant and A.C. returned to Moss’s house and Appellant told him that they had gotten the
money. A.C., who was carrying his .22 rifle, then said, “I shot that fool.” Appellant and A.C. split
the $81.00 they obtained in the robbery. When Moss told A.C. that he could not believe he had shot
someone for $80, A.C. said that the man “got what he deserved.” Both Moss and Appellant
confronted A.C. about shooting the man. The trio used the robbery proceeds to purchase more
cocaine. 
            The news media aired the video of the crime in an effort to identify and find the suspects. 
When Appellant’s mother saw the video and recognized her son, she confronted him about it. 
Appellant turned pale and began sobbing. She told him to wait and immediately called the police
to report that she had recognized her son in the video. 
            A grand jury indicted Appellant for capital murder. The trial court instructed the jury on the
law of parties as it applies to a conspiracy, and it also instructed the jury on the lesser included
offense of aggravated robbery. The jury found Appellant guilty of capital murder.
CHANGE OF VENUE
            In Issue Three, Appellant contends that the trial court erred by overruling his motion for
change of venue due to pretrial publicity. His motion alleged that the news coverage in the print and
broadcast media prejudiced his right to a fair trial. He attached two supporting affidavits and the
motion for change of venue filed in A.C.’s prosecution.


 The State responded with two controverting
affidavits. 
            An El Paso attorney, Ronald Henry, and a private investigator, Arnold Davis, testified at the
change of venue hearing on behalf of Appellant. Based on conversations had in the courthouse and
with his family and friends, Henry believed Appellant could not receive a fair trial because the
people he spoke with believed Appellant was guilty even though they had heard no evidence. Henry
conceded that he had often heard people express the same opinion about many other cases based on
a general perception that if the defendant is on trial, he must have done something wrong. Henry had
read three newspaper articles written about the case and published on October 30, 2002, October 31,
2002, and November 1, 2002, but there had been no newspaper coverage of Appellant’s case since
that time. There had been newspaper articles covering A.C.’s case, and Henry agreed with the
prosecutor that they mentioned Appellant’s name only “in passing.” According to the newspaper
articles admitted into evidence, police released surveillance tapes of the offense to the news media. 
Henry had seen the video of the shooting on television twice. 
            Davis was familiar with Appellant’s case because he had seen the video of the offense when
it aired on a local television station “a few times.” Davis believed that the news coverage describing
the victim as a well-liked veteran generated sympathy for the victim and made it impossible for
Appellant to receive a fair trial. Davis had spoken with his family members and a bartender about
the case and believed that the pretrial publicity had been prejudicial. Because Davis’s wife works
for the County Attorney’s Office which was involved in the prosecution of A.C. and Davis often
speaks with attorneys in the course of his investigative work, he admitted that his knowledge of the
case is likely different than that of the typical juror. Davis was not familiar with the number of
people in the community familiar with the case as a result of pretrial publicity. At the conclusion
of the hearing, the court determined that Appellant had not shown that publicity had permeated the
community to the degree that potential jurors could not set aside their opinion, and thus, denied the
motion. The trial court subsequently granted Appellant’s request to distribute a questionnaire to
venire members to determine their exposure to the case and whether they could be fair and impartial. 
The court ruled that it would ask the panel whether anyone was familiar with the case based on
pretrial publicity and would conduct individual voir dire to determine whether the potential juror
could be fair and impartial. 
            At voir dire, 55 members of the 180 member panel told the trial court they had been
influenced by media coverage of the case, and of these, 52 jurors were excused. The remaining 127
venire members completed the questionnaire submitted by Appellant. While waiting for those
responses, Appellant re-urged his motion for change of venue based upon the responses of the 52
venire members who had been influenced by the media coverage. He also asked to put on additional
evidence concerning how many times the news stories about the case had aired, including local live
coverage of A.C.’s trial. The State objected since it had not been given notice and was unprepared
to meet Appellant’s evidence. The trial court refused to “have another hearing on change of venue.” 
Stating that the most reliable evidence had been presented during voir dire, the trial court denied the
motion because only 52 members of the 180 member panel had to be excused due to familiarity with
the case. Based upon voir dire, the trial judge did not believe that the community had been
permeated with prejudicial coverage about the case. Voir dire continued the following day after
counsel had an opportunity to review the questionnaires. Of the 69 venire members who had seen
the video of the shooting, six stated they would be unable to apply the presumption of innocence. 
Thus, 58 members of the 180 member venire panel were excused because they had already formed
an opinion about Appellant’s guilt or innocence based on pretrial publicity. After peremptory
challenges had been made, Appellant again requested a change of venue and submitted a bill of
exception which included the juror questionnaires and a transcript of testimony from A.C.’s change
of venue hearing showing the number of people in the community who had seen the news broadcasts
concerning the case. 
The Standard of Review

            For an accused to receive a fair trial consistent with due process of law, the jury must
determine his guilt or innocence on the basis of the evidence admitted at trial and not on the basis
of other facts or allegations appearing in the media. Narvaiz v. State, 840 S.W.2d 415, 428
(Tex.Crim.App. 1992). Mere juror exposure to news accounts of the crime does not, by itself, raise
a presumption the defendant was deprived of due process and cannot receive a fair trial by an
impartial jury. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Russell
v. State, 146 S.W.3d 705, 710 (Tex.App.--Texarkana 2004, no pet.). Due process does not require
that jurors be completely ignorant of the facts of the case. Narvaiz, 840 S.W.2d at 428. 
            A trial court may change venue upon a showing that there exists so great a prejudice against
the defendant in the county where the prosecution is commenced that he cannot obtain a fair and
impartial trial. Tex.Code Crim. Proc. Ann. art. 31.03(a)(1)(Vernon 1989). In determining whether
a defendant is entitled to a change of venue when prejudicial pretrial publicity exists, the test
required by due process is whether the defendant can receive a trial by an impartial jury free from
outside influences, or whether there is a reasonable likelihood the pretrial publicity would prevent
a fair trial. Adami v. State, 524 S.W.2d 693, 703-04 (Tex.Crim.App. 1975); Russell, 146 S.W.3d at
710. Where outside influences affecting the community’s climate of opinion as to a defendant are
inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards,
such as a change of venue, to assure a fair and impartial trial. Henley v. State, 576 S.W.2d 66, 71
(Tex.Crim.App. 1978); Russell, 146 S.W.3d at 710. 
Factors to be Considered
            Some relevant factors in determining whether outside influences affecting the community
climate of opinion as to a defendant are inherently suspect are (1) the nature of the pretrial publicity
and the particular degree to which it has circulated in the community; (2) the connection of 
government officials with the release of the publicity; (3) the length of time between the
dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area
from which the jury panel is to be drawn; (6) other events occurring in the community which either
affect or reflect the attitude of the community or individual venire members toward the defendant;
and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
Henley, 576 S.W.2d at 71-72.
Nature of Pretrial Publicity
            The pretrial publicity in the El Paso area consisted of newspaper articles and the surveillance
video broadcast by local televisions stations in the days following the offense. Defense Exhibit 2
consists of two newspaper articles printed on the same page. The first article, entitled “Victim was
Army vet who liked people,” contains a photograph of Potts in a military uniform. The article
describes him as a kind man who enjoyed working at the convenience store and being in contact with
people. The article also reported the impact his death had on his family and friends. The second
article is a relatively short piece describing the offense and the ongoing investigation to find the
suspects. It includes a still photograph taken from the surveillance video. Defense Exhibit 1 is a
front page newspaper article titled “Suspects Caught -- Officers Arrest 16-year-old, 19-year-old in
slaying of Good Time Store clerk.” The article identifies the unnamed 16-year-old as the shooter
and Appellant as his accomplice and states they were caught because a person “who saw the
surveillance videotape of the bloody robbery on TV news” called police and gave them a tip which
led to the arrests. The article, which included photographs of Appellant following his arrest and
Potts in a military uniform, described the video. It reported that Appellant gave a statement
implicating himself and the juvenile. Information about the victim and his family were also
included. The third newspaper article is titled, “Those who know suspects in clerk’s death not
surprised.” According to the article, a neighbor of the juvenile who was accused of shooting Potts
had heard gunshots coming from behind his home only a few days before the offense. The neighbor
regretted not calling police. The article, which included small photographs of Appellant and Potts,
identified Appellant as the juvenile’s accomplice. Appellant did not offer any evidence at his change
of venue hearing to show how wide an audience these articles reached. The three newspaper articles
about Appellant’s case reported the facts and were not prejudicial or inflammatory. There is no
evidence that the articles were not accurate or objective. 
            According to the newspaper accounts, police released the surveillance video to the news
media soon after the offense in an effort to find the suspects. Again, Appellant did not offer
evidence proving how many times the video was shown on television or the size of the viewing
audience,


 but the coverage obviously reached a sizeable audience and had an impact given that two-thirds of the venire members recalled seeing publicity about the case and one-third had formed an
opinion which could not be set aside.
Connection of Government Officials
With Release of Publicity

            Police were directly involved with the release of the surveillance videos to the news media
and did so for the laudable purpose of identifying and apprehending the suspects. Lt. George
McBain stated in one newspaper article after the suspects were caught that police had carefully
weighed the decision to release the videotape to the media, but in this case, it had worked out exactly
as they had expected. 
Length of Time Between
Publicity and Trial
            The newspaper articles admitted into evidence were published approximately one year before
trial. More recently, however, there had been coverage of the juvenile’s certification proceeding,
which had generated considerable public controversy. And shortly before Appellant’s trial began,
A.C. was tried in San Antonio. The local media dispatched reporters to provide live coverage. Even
though Appellant was not the focus of those stories, they nevertheless served to remind the public
of the offense in the weeks just prior to Appellant’s trial.
Severity and Notoriety of the Offense
            Any capital murder is, obviously, a serious offense. One of the newspaper articles stated that
Pott’s murder was the first convenience store homicide. The news media also made the public aware
that the victim was a well-liked family man who had won three Purple Hearts and other medals
during his military service in Viet Nam. But what makes this case especially notorious is that a large
number of the public watched a video of Appellant and the co-defendant committing the offense. 
It cannot be disputed that seeing a video of a person being robbed and gunned down is markedly
different and likely to have a greater emotional impact on the viewer than reading a newspaper
account about the offense and the police investigation. Pictures often speak louder than words.
Impact of Publicity
            The evidence presented at the change of venue hearing was simply insufficient to warrant a
change of venue. While Appellant’s witnesses testified about the opinions shared by their families,
friends, and acquaintances in the legal community of El Paso, Appellant presented no evidence
indicating that publicity had permeated the entire community to the point that a fair and impartial
jury could not be obtained.
Candor and Veracity of Prospective Jurors on Voir Dire 
            At voir dire, however, the trial court had a significantly better idea as to the impact of
publicity on the potential jurors. Although the publicity had not been pervasive, inaccurate, or
inflammatory, approximately two-thirds of the venire panel members (121 of the 180 member panel)
were familiar with the case as a result of pretrial publicity. Of these, 58 members--two folks shy of
one-third of the panel--had formed an opinion about Appellant’s guilt which could not be set aside,
and thus, had to be excused by the trial court. It is clear from the record that the trial court
endeavored to select a fair and impartial jury from the remaining panel members. We also bear in
mind that the trial court was in the unique position of hearing the testimony of the potential jurors
and gauging the sincerity of their responses in light of the publicity about the case. But the
successful qualification of a jury panel is not the sole criterion in determining whether a defendant
is entitled to a change of venue, since conscious or subconscious juror prejudice can affect answers
obtained on voir dire. Henley, 576 S.W.2d at 71; Russell, 146 S.W.3d at 711. Although it was
possible to select a jury whose members were not subject to a challenge for cause, Appellant was
entitled to a change of venue if he could show that there were influences in the community which
could affect the answers on voir dire. See Henley, 576 S.W.2d at 72. 
            The State cites Neumuller v. State, 953 S.W.2d 502 (Tex.App.--El Paso 1997, pet. ref’d) in
support of its argument that denial of a motion for change of venue is not an abuse of discretion even
where a majority of the venire panel is familiar with the case. In Neumuller, the trial court heard
conflicting evidence as to whether the defendant could obtain a fair trial in Crockett County. 
Publicity about the case consisted of twelve articles in the Ozona newspaper and two press releases
by the Crockett County Sheriff’s Office. Of the 98 member venire panel, 65 had read about the case,
67 had previously discussed the case, 54 knew the victim, 8 knew the defendant, 13 knew one of the
State’s witnesses, 30 were related or had some connection to law enforcement officers, and 44 had
a prior opinion of guilt. But each of the prospective jurors stated that they could set aside their
opinion and try the case based on the evidence. Neumuller, 953 S.W.2d at 509-10. Noting that
jurors need not be entirely ignorant of the facts of a case to be qualified, we held that extensive
knowledge in the community of either the crime, the victim or the defendant, standing alone, is not
sufficient to render the trial unfair. Neumuller, 953 S.W.2d at 509. The instant case is
distinguishable for two reasons. First, the nature of the publicity is quite different since potential
jurors had the opportunity to watch a videotape of the actual crime being committed. Second, a large
number of the potential jurors in the instant case could not set aside their opinion. This strongly
indicates that pretrial publicity resulted in actual, identifiable prejudice to Appellant.
Conclusion
            Based on our analysis of the foregoing factors and the unique facts of this case, we conclude
that outside influences affecting the community climate of opinion were inherently suspect, and the
trial court abused its discretion in impliedly finding otherwise. The resulting probability of
unfairness required that the trial court grant Appellant’s motion to change venue to assure a fair and
impartial trial. See Henley, 576 S.W.2d at 71. Issue Three is sustained. Due to our resolution of this
issue, it is unnecessary to address the remaining issues. The judgment of the trial court is reversed
and the cause is remanded for a new trial.



August 31, 2005                                                          
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Barajas, C.J., McClure, and Chew, JJ.

(Publish)