Charles GONZALEZ, Appellant

v.

The STATE of Texas.

No. PD–1750–05.

Court of Criminal Appeals of Texas.

May 9, 2007.

change of venue after there was a pretrial, public dissemination of a surveillance video of the alleged offense. We hold that the trial court did not err.

## I. BACKGROUND

### A. Factual Summary

On October 29, 2002, appellant and his juvenile companion, Adam C., entered a Good Times Store in El Paso County. Adam carried a .22 rifle. The store was equipped with surveillance cameras, which recorded appellant and Adam entering the store, threatening the victim with the rifle, and demanding that he turn over "everything." After appellant took the cash, Adam shot the victim once in the chest, killing him. In an attempt to identify and locate the suspects, local newscasts aired the surveillance tape depicting the murder of the convenience store clerk. Numerous newspaper articles also covered the murder and the search for the culprits.[1] Appellant was recognized and reported to the police.

### B. Trial

Appellant was arrested for capital murder. At a pretrial hearing on a defense motion for change of venue, appellant called two witnesses. The first, El Paso attorney Ronald Henry, testified that he did not believe that appellant could receive a fair trial in El Paso County. He based this conclusion upon his conversations with individual citizens, both in the courthouse and throughout the community. Henry also testified that the media coverage in this case was abnormally heavy, compared to a regular criminal case in the county.

Ruben P. Morales, El Paso, for Appellant.

J. Landon K. Schmidt, Asst. District atty., El Paso, Matthew Paul, State's Atty., Austin, for State.

### OPINION

KELLER, P.J., delivered the opinion of the Court in which PRICE, WOMACK, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined.

The issue in this case is whether the trial court erred in denying a motion for

1. Appellant introduced three newspaper articles into evidence at the hearing on the motion to change venue. See *Gonzalez v. State*, 2005 Tex.App. LEXIS 7146, at *10–12, 2005 WL 2095108, at *2, 225 S.W.3d 102, 105 (Tex.App.-El Paso 2006).

As examples of this, he used three newspaper articles from the time of the offense and the television broadcasts showing the surveillance video. Henry remarked that he had seen the video on television twice. He agreed on cross-examination that, in the year leading up to the venue hearing, he had not seen any media coverage mentioning appellant, other than in passing in articles about his fellow defendant, Adam.

The second of appellant's witnesses was private investigator Arnold Davis. Davis testified that he had become familiar with the case from seeing footage from the surveillance video on the news, which he described as "play[ing] the video repeatedly." He was unable to remember specifically how often it was played, other than saying that it was "at least every time the news was on." Davis also talked about the positive coverage that the victim in the case received after the murder. Finally, he testified that, through his conversations with people in the community, he believed that appellant would not be able to receive a fair trial in El Paso County. Under cross-examination, Davis acknowledged that he did not know how many people had actually seen the television footage or read the newspaper coverage of this particular case, nor could he make an informed judgment as to how other El Paso residents reacted to the coverage.

After hearing this testimony, the court stated, "[A]lthough [appellant's witnesses] testified that [the pretrial publicity] has touched certain people, I have no evidence before me as to what extent it has permeated into the community." The court denied the motion, finding it premature, and stated that appellant could reassert the motion after voir dire. At voir dire, roughly two-thirds (121 out of 180) of the jury panel members informed the trial court that they had heard of the case, and roughly one-third (58 out of 180) of the panel members stated that they had formed an opinion about the case that they could not set aside. After voir dire, citing the number of people who had either heard of the case or formed an unalterable opinion about the case, appellant re-urged his motion for a change of venue, which was again denied. Appellant was subsequently convicted and sentenced to life in prison.

## C. Appeal

On appeal, appellant contested the trial court's decision to deny the motion for change of venue. The Court of Appeals reversed, holding that pretrial publicity resulted in "actual, identifiable prejudice" to appellant. The factors the court cited included the nature of the pretrial publicity, the connection of government officials with the publicity, the length of time between the publicity and the trial, the severity and notoriety of the offense, the impact of the publicity, and the candor and veracity of prospective jurors during voir dire.[2] Noting that "pictures often speak louder than words," the court also stated that the presence of the surveillance video moved the trial court's ruling outside the court's discretion.[3] Based on these factors, which were derived from our opinion in *Henley v. State*, the court held that the prejudice was so great that Appellant could not obtain a fair trial in El Paso.[4]

**2.** *Gonzalez,* 2005 Tex.App.LEXIS 7146, at *10, 2005 WL 2095108, at *4, 225 S.W.3d at 106.

**3.** *Id.* 2005 Tex.App. LEXIS 7146, at *14, 2005 WL 2095108, at *5, at 106.

**4.** *Id.* 2005 Tex.App. LEXIS 7146, at *17–18, 2005 WL 2095108, at *5-*6, at 106, *citing Henley v. State,* 576 S.W.2d 66 (Tex.Crim.App. 1978).

## D. Contentions of the Parties

The State contends that the El Paso Court of Appeals failed to grant proper deference to the trial court's decision to deny the motion to change venue. It argues that the trial court was in the best position to evaluate the extent of prejudice to the jury during voir dire and that the evidence of prejudice was, at best, conflicting, which placed the trial court's decision within the zone of reasonable disagreement. Consequently, the State claims that the court of appeals incorrectly substituted its own judgment for that of the trial court.

Appellant responds by arguing that the trial court abused its discretion by denying the motion to change venue. Appellant notes that he produced testimony, characterized by the trial court as truthful, that he could not receive a fair trial in El Paso, while the State did not present any evidence to the contrary. Appellant also argues that the trial court excused over one-third of the jury panel on the basis of the pretrial publicity concerning the murder. He argues that the present case is distinguishable from *Neumuller v. State*[5] by the fact of the video of the crime being publicized.

## II. Analysis

■ Section 31.03(a) of the Code of Criminal Procedure provides that a change of venue may be granted if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." To justify a change of venue based upon media attention, a defendant must show that the publicity was pervasive, prejudicial, and inflammatory.[6] Widespread publicity by itself is not considered inherently prejudicial.[7] Indeed, even extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage.[8] The mere existence of media attention or publicity is not enough, by itself, to merit a change of venue.[9]

■ The standard of review on appeal from a ruling on a motion for change of venue is "abuse of discretion." If the trial court's decision concerning a motion for a change of venue falls within the zone of reasonable disagreement, it will be upheld.[10]

## A. Pervasiveness of the Publicity

■ The two primary means of discerning whether publicity is pervasive are a hearing on the motion to change venue and the voir dire process. The trial court in this case used both.

5. *Neumuller v. State*, 953 S.W.2d 502 (Tex. App.-El Paso, 1997, pet. ref'd).

6. *Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim.App.2001).

7. *See Renteria v. State*, 2006 Tex.Crim.App.LEXIS 1919, *48–49 (Tex.Crim. App.2006); *Dewberry*, 4 S.W.3d at 745 n. 5; *Bell v. State*, 938 S.W.2d 35, 46 (Tex.Crim. App.1996).

8. *Faulder v. State*, 745 S.W.2d 327, 338–339 (Tex.Crim.App.1987).

9. *See Bell*, 938 S.W.2d at 46; *Willingham v. State*, 897 S.W.2d 351, 357 (Tex.Crim.App. 1995); *Teague v. State*, 864 S.W.2d 505, 509 (Tex.Crim.App.1993).

10. *See Narvaiz v. State*, 840 S.W.2d 415, 428 (Tex.Crim.App.1992); *Penry v. State*, 903 S.W.2d 715, 727 (Tex.Crim.App.1995); *Ransom v. State*, 920 S.W.2d 288, 299 (Tex.Crim. App.1994).

At the hearing, appellant introduced into evidence three newspaper articles, all written at the time of the offense. Appellant also presented the opinions of two witnesses on the amount of publicity that the case had generated, the surveillance video that was included in newscasts, and the effect of that publicity on the community at large. However, there was no evidence of how many times the video was shown nor of how many people actually saw the broadcast. Similarly, no evidence was presented as to how many people saw the newspaper coverage of the case.[11] The only evidence of how widespread the publicity's audience was, or the effect of the publicity on that audience, came from appellant's two witnesses at the venue hearing, as laid out above, which the trial court had discretion to consider or discount as it saw fit.

In regard to the voir dire process, appellant argues that the number of jurors that were unable to serve on a jury in this case demonstrates the extent to which pretrial publicity had permeated the community. Here, out of 180 members on the panel, 121 were familiar with the case, and 58 had formed an opinion that they would not be able to set aside. By appellant's reasoning, the fact that approximately two-thirds of the panel had heard about the case, and that approximately one-third of the panel had an opinion that could not be set aside, is reason enough to consider the entire community "infected" by the pretrial publicity. But this conclusion does not comport with existing caselaw. In the past, this Court and other appellate courts have found trial courts within their discretion when they seated panels where 69 veniremembers out of 109 had seen publicity on the accused's case,[12] where 44 out of 72 had seen publicity on the defendant's case,[13] and where 52 panelists out of 64 had seen something on the defendant's case.[14] Likewise, we have found trial courts within their discretion when they seated juries where 15 veniremembers out of 77 stated that they had an opinion that could not be set aside,[15] and where 39 out of 112 held that same view.[16]

The trial court in this case heard responses from numerous jurors, both as to whether they had heard of the case and as to whether they would be able to be fair and impartial. The trial court was within its discretion to believe the jurors' assurances that 1) they had not seen any publicity on the case, or 2) that the publicity had not influenced them to the point that they could not deliver a fair verdict. The fact that there were a number of panelists that had heard of the case, or that could not set aside their opinions on the case, does not establish that the pretrial publicity permeated the community to such an extent that the decision to deny the motion for a change of venue was outside the zone of reasonable disagreement. While the lack of pervasiveness alone would be enough to sustain the trial court's ruling, we will also

**11.** For examples of what form such evidence could take, see *Mayola v. Alabama,* 623 F.2d 992, 998 (5th Cir.1980); *United States v. Ricardo,* 619 F.2d 1124, 1131–1132 (5th Cir. 1980).

**12.** *Von Byrd v. State,* 569 S.W.2d 883, 890–891 (Tex.Crim.App.1978)

**13.** *Russell v. State,* 146 S.W.3d 705, 714 (Tex. App.-Texarkana 2004, pet. ref'd)

**14.** *Crawford v. State,* 685 S.W.2d 343, 349–350 (Tex.App.-Amarillo 1984), rev'd on other grounds, 696 S.W.2d 903 (Tex.Crim.App. 1985).

**15.** *Gardner v. State,* 733 S.W.2d 195, 204–205 (Tex.Crim.App.1987)

**16.** *Taylor v. State,* 420 S.W.2d 601, 604 (Tex. Crim.App.1967)

examine the question of whether the publicity was inflammatory and prejudicial.

## B. Prejudicial and Inflammatory Character of the Publicity

 In examining whether the pretrial publicity is prejudicial and inflammatory, a trial court may take three matters into consideration: 1) the nature of the publicity, 2) any evidence presented at a change of venue hearing, and 3) testimony received from veniremembers at voir dire.[17] News stories, be it from print, radio, or television, that are accurate and objective in their coverage, are generally considered by this Court not to be prejudicial or inflammatory.[18] Appellant points to the publication of the surveillance video as a distinguishing feature of this case. He describes the video as "gruesome and disturbing," and "the most prejudicial piece of evidence" presented by the State in its prosecution. Appellant argues, in light of the testimony presented at the hearing and the answers given by the jury panel at voir dire, that the inclusion of the surveillance video, along with the other coverage of the crime, makes the pretrial publicity inflammatory and prejudicial.

Over the last forty years, this Court has been reluctant to hold that pretrial publicity in a case was so prejudicial and inflammatory that the trial court's decision to deny a change of venue was outside the zone of reasonable disagreement.[19] Although we have taken up the issue numerous times in recent years, in only two cases have we found that a trial court abused its discretion in connection with denying a motion to change venue: *Henley* and *Rubenstein*.[20] Because *Henley* involved the court's failure to hold a hearing or allow the introduction of evidence on pretrial publicity, it is not instructive as to the issue in this case.[21] *Rubenstein* is more applicable. Jack Rubenstein, also known as Jack Ruby, was arrested and indicted for the murder of Lee Harvey Oswald. Rubenstein shot and killed Oswald as he was being moved from the Dallas city jail to the county jail.[22] The jail transfer was being covered by both national and local press.[23] In the local coverage, news stories stated "directly, indirectly, by hints and innuendoes that a Communist conspiracy existed between Oswald and Ruby."[24] Rubenstein was referred to as a "tough guy" or "Chicago mobster" in the press, and Rubenstein's shooting of Oswald was seen on television by "countless thousands" of Dallas County residents.[25] Rubenstein filed a pretrial motion for change of venue, which was denied. His conviction was overturned on appeal on other grounds, but this Court

17. *Bell*, 938 S.W.2d at 46.

18. *See Bell*, 938 S.W.2d at 46; *Willingham*, 897 S.W.2d at 357; *Johnson v. State*, 773 S.W.2d 322, 324–325 (Tex.Crim.App.1989); *Beets*, 767 S.W.2d at 743. *See also Patton v. Yount*, 467 U.S. 1025, 1033–1034, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

19. *See, e.g., Bell*, 938 S.W.2d 35; *Penry*, 903 S.W.2d 715; *Teague*, 864 S.W.2d 505; *Narvaiz*, 840 S.W.2d 415; *Henley*, 576 S.W.2d 66; *Von Byrd*, 569 S.W.2d 883; *Garcia v. State*, 513 S.W.2d 82 (Tex.Crim.App.1974); *Rubenstein v. State*, 407 S.W.2d 793 (Tex.Crim.App. 1966).

20. *See Henley*, 576 S.W.2d 66; *Rubenstein*, 407 S.W.2d 793.

21. *Henley*, 576 S.W.2d at 72. *Henley* recited, but did not actually apply, the factors in determining whether a change of venue was warranted.

22. *Rubenstein*, 407 S.W.2d at 794.

23. *Id.*

24. *Id.* at 796 (McDonald, J. concurring).

25. *Id.* at 796 (McDonald, J. concurring).

also held that the trial court erred in denying the change of venue.[26] In a concurring opinion, Judge McDonald described the publicity surrounding Rubenstein's case as "a background of unusual and extraordinary invasions of the expected neutral mental processes of a citizenry," which contributed to the Court's reasoning that the trial court abused its discretion in denying a change of venue.[27]

We find the present case to be distinguishable from *Rubenstein*. The coverage by the local media in this case was accurate and objective. Although a large number of panelists were disqualified for cause because they were unable to set aside their opinion of appellant's guilt, those circumstances do not require a conclusion that the publicity was inflammatory or prejudicial.[28] Moreover, the surveillance video that appellant labels as prejudicial and inflammatory was evidence of the crime that in fact was later admitted in its entirety at trial. Because the jurors were going to be exposed to this evidence anyway, we cannot hold that the publication of a surveillance video, absent other facts, was by itself prejudicial and inflammatory.[29]

The trial court received the documentary evidence and heard the testimony of the witnesses during the pretrial hearing, and it heard the responses of the jurors at voir dire. This court affords great deference to trial courts because a trial court is in a better position to resolve issues involving testimony and other questions of fact as a result of its ability to observe the demeanor of witnesses and scrutinize their veracity face to face.[30] We see nothing in this record other than the video to distinguish this case from numerous others in which we have upheld a trial court's denial of a motion to change venue. That sole distinguishing characteristic is not sufficient to place beyond the zone of reasonable disagreement the trial court's decision to deny appellant's motion.

The judgment of the court of appeals is reversed, and the case is remanded to the court of appeals to address appellant's remaining points of error.

MEYERS, J., filed a dissenting opinion.

JOHNSON, J., concurred in the judgment of the Court.

MEYERS, J., filed a dissenting opinion.

Just because we have upheld the trial court's denial of a motion for change of venue in numerous cases does not mean that we should do so in this case. The majority says that the video of the crime is the only thing that distinguishes this case from all the other cases in which motions for change of venue were denied. And, this sole distinguishing factor is not enough to convince the majority that the trial court's decision to deny the motion for change of venue was an abuse of discretion. I disagree. The fact that the actual crime was shown on the news and that the community was asked to help identify Ap-

---

26. *Id.* at 795.

27. *Id.* at 796 (McDonald, J. concurring).

28. *See Gardner,* 733 S.W.2d at 204–205; *Taylor,* 420 S.W.2d at 604.

29. Because the video was introduced into evidence at trial, it could be said that appellant benefitted from the pretrial publicity: he found out ahead of time which people would decide his guilt solely on the basis of the video, and he was allowed to remove them from his jury. In ruling on a motion to change venue, a trial court could reasonably consider the distinction between pretrial dissemination of inadmissible evidence and pretrial dissemination of evidence that the jury will ultimately hear.

30. *Hathorn v. State,* 848 S.W.2d 101, 109 (Tex.Crim.App.1992).

pellant and his co-conspirator is more than just a minor distinguishing factor in this case. I agree with the court of appeals that "what makes this case especially notorious is that a large number of the public watched a video of Appellant and the co-defendant committing the offense. It cannot be disputed that seeing a video of a person being robbed and gunned down is markedly different and likely to have a greater emotional impact on the viewer than reading a newspaper account about the offense and the police investigation." *Gonzalez v. State*, 2005 Tex.App. LEXIS 7146 at *14, 2005 WL 2095108, at *5, —— S.W.3d ——, —— (Tex.App.-El Paso 2005).

The majority points out that there was no evidence of how many times the video was shown, or how many people had seen news coverage of the crime. However, the Appellant was prepared to present this evidence, but the State objected, and the trial judge refused to have another hearing to allow the evidence to be presented. And, Appellant submitted a bill of exception which included this information. It is interesting to note that this information was presented in support of Appellant's co-conspirator's motion for change of venue, which was granted.

The court of appeals used the proper standard in analyzing this case and did not ignore the trial court's efforts. The court stated that,

It is clear from the record that the trial court endeavored to select a fair and impartial jury from the remaining panel members. We also bear in mind that the trial court was in the unique position of hearing the testimony of the potential jurors and gauging the sincerity of their responses in light of the publicity about the case. But the successful qualification of a jury panel is not the sole criterion in determining whether a defendant

is entitled to a change of venue, since conscious or subconscious juror prejudice can affect answers obtained on voir dire. Although it was possible to select a jury whose members were not subject to a challenge for cause, Appellant was entitled to a change of venue if he could show that there were influences in the community which could affect the answers on voir dire.

*Id.* 2005 Tex.App. LEXIS 7146, at *15, 2005 WL 2095108, at *5, at —— (citations omitted). The court of appeals determined that there are two things that distinguish this case from others in which a majority of the venire is familiar with the case. "First, the nature of the publicity is quite different since potential jurors had the opportunity to watch a videotape of the actual crime being committed. Second, a large number of the potential jurors in the instant case could not set aside their opinion. This strongly indicates that pretrial publicity resulted in actual, identifiable prejudice to Appellant." *Id.* 2005 Tex.App. LEXIS 7146, at *17, 2005 WL 2095108, at *6, at ——. Instead, the majority says that because the media coverage was accurate and objective, it was not prejudicial or inflammatory.

I agree with the holding of the court of appeals that under the unique facts of this case, there was a high probability of unfairness, making it necessary for the trial court to grant Appellant's motion to change venue in order to assure a fair and impartial trial.