**Opinion filed April 5, 2018**



# In The

# Eleventh Court of Appeals

_____

## No. 11-16-00128-CR

_____

## JAY DEE BURNS, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause No. A-45,138**

## MEMORANDUM OPINION

The grand jury indicted Jay Dee Burns, a former teacher at Permian High School, for nine offenses that arose out of his conduct with two students. The trial court consolidated all nine indictments into a single case for trial, and Appellant pleaded guilty to all nine offenses. As instructed by the trial court, the jury convicted Appellant of all nine offenses. The jury assessed punishment at fifteen years' confinement for each of the three offenses of sexual assault of a child and for one offense of indecency with a child. The jury assessed punishment at ten years' confinement for the offense of stalking and for each of the four offenses of improper

relationship between educator and student. The trial court stacked the fifteen-year sentences and ordered that the ten-year sentences would run concurrently. Appellant raises three issues on appeal. We affirm.

## I. *The Charged Offenses*

The grand jury returned nine indictments against Appellant. Indictments A and B were for the offense of improper relationship between an educator and student.[1] Indictments C, D, and E were for the offense of sexual assault of a child.[2] Indictment F was for the offense of indecency with a child.[3] Indictment G was for the offense of stalking.[4] Indictments H and I were for the offense of improper relationship with a second student.

## II. *Evidence at Trial*

Appellant was a teacher at Permian High School in Odessa, Texas. After his divorce, he created profiles on dating websites. Some of these websites featured erotic themes, including fetishes such as "BDSM" (Bondage, Discipline, Dominance Submission, Sadism, and Masochism) and "DDLG" (Daddy Domination Little Girl). On one of these websites—FetLife—Appellant contacted another user, H.H., who turned out to be an eighteen-year-old student at Permian High School. Initially, Appellant told H.H. that they should not talk until after she graduated from high school, but they continued to communicate.

### A. *Appellant meets H.H.*

Appellant and H.H. decided to meet at a coffee shop. H.H. brought a friend, J.A., who was a sixteen-year-old student at Permian High School. H.H. told

---

[1]*See* TEX. PENAL CODE ANN. § 21.12 (West Supp. 2017).

[2]*See id.* § 22.011.

[3]*See id.* § 21.11.

[4]*See id.* § 42.072 (West 2016).

2

Appellant that J.A. did not know the purpose of the meeting, so they discussed books and school for about an hour. They did not discuss sex.

After the first meeting, Appellant continued to contact H.H. through FetLife, and their conversations became progressively more sexual. H.H. considered her relationship with Appellant to be a BDSM fetish in which she played the submissive role and Appellant played the dominant role.

H.H. eventually met Appellant at his apartment. H.H. and Appellant sat on a couch and kissed. They then decided that Appellant would spank H.H. H.H. performed oral sex on Appellant. Appellant placed his hands down H.H.'s pants and "fingered" her for about a minute, and then he told her that she should go home.

*B. Appellant contacts J.A.*

Appellant distanced himself from H.H., and he began messaging J.A. through Tumblr and another platform called Kik. J.A. had a Tumblr account related to BDSM. At first, Appellant only used a pseudonym, Harry, to communicate with J.A. Over time, J.A. noticed that some of the messages from "Harry" were consistent with things that Appellant said during class. Appellant eventually admitted his true identity and warned J.A. that she would lose her opportunity to become a nurse and that H.H.'s life would be ruined if anyone found out about him.

J.A. met with Appellant and reassured him that she would not tell others about their relationship. Appellant brought a bracelet with a BDSM charm on it to the meeting, and he gave it to J.A. The charm was in the shape of a collar, which symbolized Appellant's ownership of J.A. and his dominance over her within their relationship.

Within the first week of meeting J.A. in person, Appellant asked J.A. to help his daughter with her schoolwork and to study the Bible with her. When asked at trial to clarify whether Appellant wanted her to play with his daughter "like a

3

teenager, or play with her like a little girl," J.A. answered, "Play with her as a little girl." Appellant dressed J.A. in clothes that a little girl would wear.

Appellant and J.A. were in a DDLG relationship. J.A. testified that, in this relationship, Appellant "had complete control over me and my actions as the little girl." J.A. described the dynamic between her and Appellant: "It's a very domineering type of atmosphere where it is understood that he is in complete control. He is the dominant, and I am the submissive. I'm not to be speaking unless I have been spoken to." J.A. entered into a "sex contract" with Appellant in which they made promises that they would follow within their relationship. Appellant instructed J.A. to present the sex contract to him on her knees with her "palms facing up like presenting it as a gift to him."

Afterward, they began having sexual contact. J.A. described Appellant's control over her during their sexual encounters: "It -- he's just in complete control. I'm not supposed to orgasm until he tells me to. And how many times he tells me to." Appellant instructed J.A. how and when to perform oral sex on him. Appellant performed multiple sex acts in which J.A. was either handcuffed, was wearing a "ball gag," was tied to the bed, or had clamps placed on her vagina and nipples. Appellant choked J.A. with a hard grip, and in at least one encounter with Appellant, she experienced an illusion and started to blackout. Appellant also "punished" J.A. when he spanked her with his open hand or with paddles.

One day, J.A. deleted one of her Tumblr accounts without Appellant's permission, which made him angry. When Appellant told J.A. that she would be punished, she thought it would not be bad. However, she went to Appellant's apartment, and he made her write that "Princess" would not disobey "Daddy" twenty-five times and hit her hard five times with a leather paddle. When asked at trial whether this was play punishment or real punishment, J.A. testified, "This was real punishment." J.A. said that the blows were hard enough to move her body and

4

that they made her cry. The severe blows he inflicted caused bruises on her buttocks and thighs and made it difficult for her to sit down the next day.

J.A. described how this severe punishment affected her: "It completely changed my views on being with him. I knew at this point that he was abusing me, not just physically where I was being left with scars and bruises, but also emotionally. Because that's not normal." J.A. eventually went to Appellant's apartment to end the relationship. When she tried to break up with him, Appellant flipped a table over and cornered J.A. Appellant placed his hands inside J.A.'s pants, and J.A. testified that "he proceeded to finger me against my will." Appellant's forcefulness caused her to spot blood "for the next couple of days." J.A. testified that she wanted out of the relationship because she "got tired of the abuse."

### C. Appellant's Arrest, Media Coverage, and Motion for Change of Venue

Appellant's relationships with J.A. and H.H. led to rumors at Permian High School. H.H. became concerned about how the rumors would affect her friendships and her future, and she attempted to commit suicide when she overdosed on Tylenol, anti-depressants, and anti-anxiety medication. A family member found her, and H.H. recovered at the hospital. After this, H.H. and J.A. spoke with police about Appellant, and the police arrested him.

Before trial, Appellant complained that he could not receive a fair trial because of prejudice stemming from media coverage of his case and the cases of other teachers facing similar charges. He filed a motion to transfer venue and, in support, attached the statutorily required affidavits from himself and Ector County residents. *See* TEX. CODE CRIM. PROC. ANN. art. 31.03(a) (West 2006). After the hearing on the motion, in which Appellant presented evidence, the trial court denied his motion but carried it forward to reconsider after voir dire. After voir dire, the trial court again considered the motion and denied it.

5

III. *Analysis*

Appellant, in his first issue, asserts that the trial court abused its discretion when it denied Appellant's motion for change of venue based on pretrial publicity. In his second issue, he asserts that the trial court abused its discretion when it allowed testimony about legal, consensual sexual conduct over Appellant's Rule 404(b) and Rule 403 objections. In his third issue, he argues that a mistake by the trial court in its oral pronouncement of Appellant's sentences invalidates two convictions and the trial court's cumulation order. We address Appellant's three issues in turn.

> A. <u>Issue One</u>: *The trial court did not abuse its discretion when it denied Appellant's motion for change of venue because Appellant failed to show pretrial publicity was pervasive, prejudicial, and inflammatory.*

Appellant first complains that pretrial publicity about his case was pervasive, prejudicial, and inflammatory and, therefore, that the trial court abused its discretion when it denied the motion for change of venue. The standard of review for a trial court's ruling on a motion for change of venue is abuse of discretion. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007); *Billings v. State*, 399 S.W.3d 581, 591 (Tex. App.—Eastland 2013, no pet.). We will uphold the trial court's ruling as long as its decision was reasonable. *Gonzalez*, 222 S.W.3d at 449.

A trial court may grant a change of venue to a defendant if "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." CRIM. PROC. art. 31.03(a)(1). "To justify a change of venue based upon media attention, a defendant must show that the publicity was pervasive, prejudicial, and inflammatory." *Gonzalez*, 222 S.W.3d at 449. Establishing widespread coverage of a case is not enough; the defendant must also produce evidence "of prejudicial or inflammatory coverage." *Id.*

"The two primary means of discerning whether publicity is pervasive are a hearing on the motion to change venue and the voir dire process." *Gonzalez*, 222

S.W.3d at 449. During voir dire, the trial court has the "discretion to believe the jurors' assurances" about whether they were exposed to publicity or whether they could set aside what they learned outside of trial to deliver a fair verdict. *Id.* at 450. And the circumstance that the trial court excuses several veniremembers "because they were unable to set aside their opinion" does "not require a conclusion that the publicity was inflammatory or prejudicial." *Id.* at 452.

At the hearing on the motion, Appellant presented another affidavit from a local news director at KWES to show that the station had produced forty-five reports about Appellant's arrest and prosecution. The State presented two witnesses in opposition. The State's witnesses testified about their business and political ties to the local community and about how they kept track of the news. One of the witnesses testified that he had heard "that there was a rash" of improper conduct between Permian teachers and students. However, neither witness watched KWES or remembered any news coverage or conversations specific to Appellant.

Seventy people served on the venire panel. A substantial number of the veniremembers had some knowledge about the case, whether it came from the news, social media, or conversations with friends. But only nine indicated that they would have difficulty setting aside what they had heard. The trial court excused all nine for cause. Of the twelve empaneled jurors, only two remembered any reports about the case. And those two jurors testified that they did not remember any specific details.

In addressing the issue of pretrial publicity, the *Gonzalez* court held that the trial court did not abuse its discretion when it denied a motion for change of venue because local media coverage "was accurate and objective." *Id.* Local news outlets aired a surveillance video that depicted the murder. *Id.* at 447. Additionally, "out of 180 members on the panel, 121 were familiar with the case, and 58 had formed an opinion that they would not be able to set aside." *Id.* at 450. However, the entire

7

video was admitted as evidence at trial, and the trial court excused the veniremembers who could not serve. *Id.* at 452. The Court of Criminal Appeals contrasted these circumstances with those in *Rubenstein v. State*, 407 S.W.2d 793 (Tex. Crim. App. 1966), where the local news coverage referred to a Communist conspiracy and labeled Rubenstein, the man who shot Lee Harvey Oswald, a "Chicago mobster." *Gonzalez*, 222 S.W.3d at 451–52. Without more facts indicating prejudicial coverage like that in *Rubenstein*, the *Gonzalez* trial court did not abuse its discretion when it denied the change of venue. *Id.* at 452.

In Appellant's case, as in *Gonzalez,* evidence of prejudicial pretrial publicity is insufficient to overcome the trial court's discretion. The evidence showed that local news about the case was at least somewhat pervasive, but it did not prove that the coverage was prejudicial. About half of the venire panel remembered any of the news coverage, and the trial court only had to excuse nine of those for cause. The only two empaneled jurors who remembered anything about the case testified that they could not recall any specific facts. Without more facts about the nature of the local news coverage, we cannot say that the trial court was unreasonable in its decision to deny change of venue. We overrule Appellant's first issue.

B. *Issue Two: Appellant failed to preserve his Rule 404(b) and Rule 403 objections.*

In his second issue, Appellant asserts that the trial court erred when it allowed testimony about legal, consensual sexual conduct over Appellant's Rule 404(b) and 403 objections.[5] The State responds that, in the punishment phase of trial, the jury was entitled to examine the pattern of Appellant's conduct when he engaged in sexual conduct with younger girls.

The State questioned two additional witnesses, other than the victims, about their sexual encounters with Appellant: B.W. and N.S. B.W. testified that Appellant

---

[5]*See* TEX. R. EVID. 403, 404(b).

initially contacted her through a dating website. B.W. had graduated from Permian High School and was eighteen years old when she began communicating with Appellant. Appellant sent B.W. a questionnaire, which included a question about whether B.W. had been molested as a child. B.W. answered that she had been molested, even though she had not, and they continued to communicate.

Appellant met B.W. once in person. They walked together near the tennis court at "UTPB," and Appellant "fingered" her. B.W. decided not to see Appellant again. B.W. testified that Appellant sent her voice mail and text messages in which he cursed at her and told her that she had hurt him. Appellant's interests in BDSM did not bother B.W., but she found him to be controlling, so she blocked his phone calls.

N.S. testified that she attended Permian High School prior to her relationship with Appellant. She was around nineteen years old at the time she began a relationship with Appellant. N.S. became friends with Appellant and exchanged text messages. Appellant sent N.S. nude pictures of himself performing fetishes. N.S. went to Appellant's apartment for a romantic meeting. At first, they engaged in kissing and "normal foreplay." They had previously discussed experimenting with BDSM practices, and N.S. testified that Appellant brought out chains.

When the prosecutor asked what Appellant did with the chains, Appellant objected, citing Rule 404(b), and argued that the prejudicial effect of the testimony outweighed its evidentiary value because the conduct with N.S. was legal. The State explained that it elicited the testimony to show that Appellant exhibited a pattern of pursuing younger females, which was relevant to the jury's determination during the punishment phase of trial as to whether Appellant posed a future threat to the community.

In order to preserve a complaint for appellate review, a party must present the trial court with a timely objection. *See* TEX. R. APP. P. 33.1(a); *Wilson v. State*, 71

9

S.W.3d 346, 349 (Tex. Crim. App. 2002). Failure to object when there was an opportunity to do so generally waives error. *Burt v. State*, 396 S.W.3d 574, 577–78 (Tex. Crim. App. 2013). An error in admitting evidence "'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling,' whether introduced by the defendant or the State." *Atnipp v. State*, 517 S.W.3d 379, 392–93 (Tex. App.—Eastland 2017, pet. ref'd) (quoting *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010)).

Here, Appellant failed to preserve error both because the objection was not timely and because it was not raised during B.W.'s testimony. By the time Appellant objected to N.S.'s testimony, she had already testified about Appellant sending her illicit text messages depicting a fetish. And B.W., who was also a consenting adult, though a recent high school graduate, testified about the sexual aspects of their relationship. Appellant objected to N.S.'s testimony too late and lodged no objection against B.W.'s substantially similar testimony. Therefore, Appellant failed to preserve error for review. *See Atnipp*, 517 S.W.3d at 392–93; *see also* TEX. R. APP. P. 33.1. We overrule Appellant's second issue.

> C. *Issue Three: The trial court's oral pronouncement of the jury-assessed punishment for the offenses in Indictments D and G was ambiguous, and we resolve the ambiguity in favor of the jury verdict.*

In his third issue, Appellant argues that the convictions for Indictments D and G and the cumulative sentencing order are invalid because the trial court orally pronounced two sentences for Indictment D but none for Indictment G at the formal sentencing hearing. The State acknowledges the issue "between no sentence as to G, and two separate sentences for two separate charges as to D" but argues that, in this context, the pronouncement was ambiguous.

"When there is a conflict between the oral pronouncement of sentence in open court and the sentence set out in the written judgment, the oral pronouncement

controls." *Thompson v. State*, 108 S.W.3d 287, 290 (Tex. Crim. App. 2003). "The rationale for this rule is that the imposition of sentence is the crucial moment when all of the parties are physically present at the sentencing hearing and able to hear and respond to the imposition of sentence." *Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002). That is why the oral pronouncement "is the appealable event, and the written sentence or order simply memorializes it." *Id.* (quoting *Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)).

However, when pronouncement of a jury verdict is ambiguous, "the jury's punishment verdict, the court's pronouncement, and the written judgment should be read together in an effort to resolve the ambiguity." *Aguilar v. State*, 202 S.W.3d 840, 843 (Tex. App.—Waco 2006, pet. ref'd); *see also Kimble v. State*, No. 02-15-00370-CR, 2016 WL 2840922, at *1 (Tex. App.—Fort Worth May 12, 2016, pet. ref'd) (mem. op., not designated for publication). When a jury assesses punishment, "the written verdict provides the basis for reforming an erroneous recitation in judgment and sentence." *Kimble*, 2016 WL 2840922, at *2 (quoting *Milczanowski v. State*, 645 S.W.2d 445, 447 (Tex. Crim. App. 1983)). The trial court has no authority to change that verdict if it conforms "with the statutory range of punishment." *Tufele v. State*, 130 S.W.3d 267, 273 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Ex parte McIver*, 586 S.W.2d 851, 854 (Tex. Crim. App. [Panel Op.] 1979)).

At the end of the punishment phase of trial, the jury delivered a unanimous written verdict for the punishment of each indicted offense. The trial court then read aloud the verdict for each offense. For Indictment D, the trial court read the following: "We, the jury, find the Defendant guilty . . . of sexual assault of a child as charged in Indictment D and assess his punishment at confinement . . . for 15 years. No fine." Regarding Indictment G: "We, the jury, find the Defendant guilty . . . of stalking as charged in Indictment G and assess his punishment at confinement

11

. . . for ten years. No fine." After reading through each verdict, the court orally pronounced its judgment that Appellant was guilty of each offense and scheduled a subsequent hearing for formal sentencing.

At the formal sentencing hearing, when the trial court read the sentences for each indictment, it did not read them in alphabetical order. Instead, the trial court first read the group of indictments with ten-year sentences and then read the group with fifteen-year sentences. Within the group of ten-year sentences, the trial court stated, "Ten years for the offense of stalking as charged in Indictment D." Then while reading the fifteen-year sentences, the trial court stated, "Fifteen years for the offense of sexual assault of a child as charged in Indictment D." Afterward, while pronouncing the cumulative order, the trial court noted that Indictments C, D, E, and F had fifteen-year sentences and that Indictments A, B, G, H, and I had ten-year sentences. The trial court then memorialized the sentences in nunc pro tunc judgments.

Appellant asserts that the trial court's apparent gaffe—when it stated "D" instead of "G" while pronouncing the ten-year sentence for the offense of stalking— resulted in a conflict between the oral pronouncement and the written judgment with respect to Indictment D and that it also resulted in a failure to orally pronounce the sentence for Indictment G. We note that the ambiguity exception "harmonizes the court-created general construct elevating oral pronouncements with the otherwise conflicting protective ladder of common law, statutes, and constitutional provisions placing valid jury verdicts on punishment beyond a trial judge's reach." *Kimble*, 2016 WL 2840922, at *1. A court can determine whether ambiguity exists and resolve it from the context of the oral pronouncement. *See Hill v. State*, 213 S.W.3d 533, 536–37 (Tex. App.—Tyler 2007, no pet.); *see also Simmons v. State*, No. 05-15-00162-CR, 2016 WL 3144254, at *2 (Tex. App.—Dallas June 6, 2016, no pet.)

(mem. op., not designated for publication) ("The context of the court's utterances should also be considered.").

For example, in *Bolding*, the trial court determined that the oral pronouncement was not ambiguous from the context of the pronouncement. *Bolding v. State*, No. 13-15-00332-CR, 2016 WL 3626224, at *9–10 (Tex. App.—Corpus Christi June 30, 2016, no pet.) (mem. op., not designated for publication). At the sentencing hearing, when the prosecutor asked whether Bolding would have to pay court costs and attorney's fees, the trial court responded that Bolding would. *Id.* at *9. However, the trial court later pronounced the sentence and said, "I will not order [Bolding] to pay attorney's fees." *Id.* (alteration in original). Because this later statement during sentencing "had a finality, formality, and comprehensiveness," the oral pronouncement was unambiguous. *Id.*

In *Kimble*, by contrast, the context of sentencing indicated that the oral pronouncement of a jury verdict was ambiguous. *Kimble*, 2016 WL 2840922, at *2. The trial court did not mention the fine within the oral pronouncement. *Id.* But prior to formal sentencing, the trial court read the entire jury verdict to be aloud, polled the jury, received the unanimous verdict on punishment, and ordered the verdict to be filed in the record. *Id.* Plus, the jury verdict that the trial court read in open court, as reflected in the reporter's record, matched "the written jury verdict as well as the trial court's written judgment." *Id.* Because the jury assessed punishment, the context of sentencing, both before and after the formal pronouncement, resolved the ambiguity in favor of the jury verdict. *Id.*

Here, the context of the formal pronouncement itself, as well as the court's reading of the jury verdict, indicated that the oral pronouncement was ambiguous and should be resolved in favor of the jury verdict. As in *Kimble*, the trial court read the jury's verdicts aloud in open court at the conclusion of the punishment phase of trial. The trial court apparently accepted the verdicts and set the case for formal

13

sentencing. Unlike *Bolding*, where the trial court made casual statements to the prosecutor about what the sentence would be, the trial court's reading of the jury's lawful verdicts in this case expressed the sentences that the trial court would certainly impose. Additionally, during the oral pronouncement of the cumulation order at the formal sentencing hearing, the trial court clarified five times that Indictment D was a fifteen-year sentence. The trial court also clarified that Indictment G was a ten-year sentence. This context before and during formal sentencing indicates that the oral pronouncements as to Indictments D and G were ambiguous and resolves that ambiguity in favor of the jury verdict. We overrule Appellant's third issue.

IV. *This Court's Ruling*

We affirm the judgments of the trial court.

MIKE WILLSON

JUSTICE

April 5, 2018

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Willson, J.,
Bailey, J., and Wright, S.C.J.[6]

---

[6]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.