ACCEPTED
03-15-00661-CR
8048215
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/2/2015 10:59:45 AM
JEFFREY D. KYLE
CLERK

NO. 03-15-00661-CR

IN THE COURT OF APPEALS

OF THE THIRD DISTRICT OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/2/2015 10:59:45 AM
JEFFREY D. KYLE
Clerk

THE STATE OF TEXAS,

Appellant

v.

TRAVIS LEE WICKSON

Appellee

Appeal in Cause No. 42899 in the
424TH Judicial District Court of Burnet County, Texas

## *Brief For Appellant*

OFFICE OF DISTRICT ATTORNEY
33RD and 424th JUDICIAL DISTRICTS

Wiley B. McAfee,
District Attorney
1701 E. Polk, Ste. 24
Burnet, Texas 78643
Telephone          Telecopier
(512) 756-5449     (512) 756-8572
w.mcafee@co.llano.tx.us
State Bar No. 13318020

Gary W. Bunyard
Assistant District Attorney
P. O. Box 725
Llano, Texas 78643
Telephone          Telecopier
(325) 247-5755     (325) 247-5274
g.bunyard@co.llano.tx.us
State Bar. No. 03353500

ATTORNEYS FOR APPELLANT

December 2, 2015

*Oral Argument Requested*

## *Identity Of The Parties*

Trial Court

> Honorable Evan C. Stubbs
> 424th Judicial District
> Burnet County Courthouse Annex (North)
> 1701 East Polk St., Suite 74
> Burnet, TX 78611

State/Appellant

> Blake Ewing                                    (Pre-Trial Counsel)
> Assistant District Attorney
> P. O. Box 725
> Llano, Texas 78643
> (325) 247-5755
> State Bar No. 24076376

> Wiley B. "Sonny" McAfee                        (Appellate Counsel)
> District Attorney
> 1701 E. Polk St., Suite 24
> Burnet, TX 78611
> (512) 756-5449
> State Bar No. 13318020
> w.mcafee@co.llano.tx.us

> Gary W. Bunyard                                (Appellate Counsel)
> Assistant District Attorney
> P. O. Box 725
> Llano, Texas 78643
> (325) 247-5755
> State Bar No. 03353500
> g.bunyard@co.llano.tx.us

Appellee

    Ray Austin Bass III                (Pre-Trial Counsel and)
    120 W. 8th St.                     Appellate Counsel
    Georgetown, Texas 78626
    State Bar No. 14242500
    ray@raybass.com


    Travis Lee Wickson             (Appellee)

# Table Of Contents

|  | Page |
|---|---|
| Index of Authorities | v |
| Statement of the Case | 1 |
| Statement on Oral Argument | 2 |
| Issues Presented | 3 |
| Statement of the Facts | 4 |
| Summary of the Argument - Issue No. 1 | 8 |

Does a trial court abuse its discretion in suppressing evidence of a breath sample and test results by holding that the Defendant's decision to give a breath sample, without considering the totality of the evidence, was involuntary on the basis of the mere mention of the trooper's intent to obtain a mandatory blood draw as opposed to obtaining a blood search warrant.

| Argument on Issue No. 1 |  |
| 1.1 Principals of Law | 9 |
| 1.2 Applicable Facts | 16 |
| 1.3 Discussion and Conclusion | 21 |
| Prayer for Relief | 30 |
| Certificate of Word Count | 31 |
| Certificate of Service | 31 |

# Index Of Authorities

Case Law                                                                                 Page

*Balentine v. State*, 71 S.W.3d 763 (Tex. Crim. App. 2002)........     12

*Erdman v. State*, 861 S.W.2d 890 (Tex. Crim. App 1993)........     14, 15, 27

*Douds v. State*, 2015 Tex. Crim. App. LEXIS 1060, PD-0857-14 (2015).....................................................     26

*Fienen v. State*, 390 S.W.3d 328 (Tex. Crim. App. 2012).........     14, 15, 27

*Gonzalez v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007).....     13

*Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997)........     12

*Harrison v. State*, 205 S.W.3d 549 (Tex. Crim. App. 2006)......     14

*Meekins v. State*, 340 S.W.3d 454 (Tex. Crim. App. 2011).......     13, 14

*Missouri v. McNeely*, ___ U.S. ___, 133 S.Ct. 1552 (2013).....     25

*Montanez v. State*, 195 S.W.3d 101 (Tex. Crim. App. 2006)....     13

*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).......................................................     13, 14

*Sherry v. State*, memorandum opinion 03-13-00126-CR (2013)     26

*State v. Ross*, 32 S.W.3d 853 (Tex. Crim. App. 2000).............     13

*State v. Weaver*, 349 S.W.3d 521 (Tex. Crim. App. 2011).......     14

Constitutions

None cited

Statutes/Rules

Tex. Pen. Code § 49.045.............................................................. 12

Tex. Transp. Code § 724.012...................................................... 11, 25

Tex. Transp. Code § 724.015...................................................... 10

Treatises/Publications

None cited

# Statement Of The Case

Appellee was Indicted for the offense of Driving While Intoxicated With A Child Passenger. CR Vol. 1 Pages 3 - 4. Counsel for Appellee filed a motion to suppress the breath test. CR Vol. 1 Pages 6 - 11. The trial court conducted a hearing on the motion to suppress on September 18, 2015. RR Vol. 2 Page 1. On September 28, 2015, at the conclusion of this hearing the trial court granted the motion to suppress and entered an order suppressing the breath test and the results thereof. RR Vol. 2 Pages 71 - 72; CR Vol. 1 Page 16. The District Attorney timely filed Notice of Appeal on behalf of the State of Texas on October 7, 2015. CR Vol. 1 Page 13.

## *Statement on Oral Argument*

The undersigned requests Oral Argument. The undersigned does believe that Oral Argument will be beneficial for this case for the reason that the issues contain complex nuances.

## *Issues Presented*

<u>Issue No. One:</u>     Does a trial court abuse its discretion in suppressing evidence of a breath sample and test results by holding that the Defendant's decision to give a breath sample, without considering the totality of the evidence, was involuntary on the basis of the mere mention of the trooper's intent to obtain a mandatory blood draw as opposed to obtaining a blood search warrant.

## Statement Of The Facts

On April 11, 2014, DPS Trooper Wilhite stopped Appellee for speeding and for failure to maintain a single lane. RR Vol. 2 Pages 16 - 18; Vol. 3 State's Exhibit 1. A check of the license plate on Appellee's vehicle came back as an Alert. RR Vol. 2 Page 19; Vol. 3 State's Exhibit 1.

While investigating these issues, Trooper Wilhite detected an odor of alcoholic beverages and observed signs of possible intoxication. RR Vol. 2 Pages 22 - 24; Vol. 3 State's Exhibit 1. Appellee's first response to questioning on alcohol consumption was that he had one large beer and later changed his answer to a few. RR Vol. 2 Page 24; Vol. 3 State's Exhibit 1. Trooper Wilhite then conducted the standardized field sobriety tests. RR Vol. 2 Pages 24 - 27; Vol. 3 State's Exhibit 1. Upon viewing several clues in the standardized field sobriety tests, Trooper Wilhite asked Appellee to provide a breath sample into a portable breath tester to which Appellee declined at first but thereafter agreed when Trooper Wilhite informed Appellee that the results of a portable breath tester was not admissible in court. RR Vol. 2 Pages 27 - 28; Vol. 3 State's Exhibit 1. Appellee was then arrested for Driving While Intoxicated With A Child Passenger, two counts. RR Vol. 2 Page 28; Vol. 3 State's Exhibit 1.

After securing Appellee in the patrol car, Trooper Wilhite gave Appellee a copy of the DIC - 24 form and also read the DIC - 24 form to Appellee. RR Vol. 2 Pages 29 - 30; Vol. 3 State's Exhibit 1. Upon conclusion of the reading of the form, Trooper Wilhite requested a sample of Appellee's breath and Appellee declined. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1. Trooper Wilhite then stated that because Appellee had children in the vehicle Trooper Wilhite was going to obtain a mandatory blood specimen. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1. Appellee responded that he was willing to give a breath sample, however, Trooper Wilhite stated that he could not accept that because Appellee had previously refused. RR Vol. 2 Page 31, Vol. 3 State's Exhibit 1. Appellee stated again that he wanted to give a breath sample and Trooper Wilhite acquiesced taking Appellee to the location where the Intoxilizer 5000 was stored. RR Vol. 2 Pages 31 - 32; Vol. 3 State's Exhibit 1. Upon arrival Appellee provided adequate breath samples into the Intoxilizer 5000 unit for the instrument to perform an accurate test result. RR Vol. 2 Pages 32 - 33; Vol. 3 State's Exhibit 1. The test result was .097 BAC. RR Vol. 2 Page 33.

At the conclusion of the hearing on Appellee's motion to suppress the trial court stated:

"Well, I don't think Officer Wilhite did anything intentionally wrong or that anything he said was necessarily not in line with what DPS policy was at the time; however, what I'm going to do, I'm going to deny the motion to suppress as to the reasonable suspicion."
RR Vol. 1 Pages 70 - 71.

After holding that there was sufficient cause for the detention and the arrest, the trial court returned to the topic of the breath test stating:

"However, I'm going to grant the motion to suppress as to the breath test results based on the statements of the officer that I believe -- I believe the defendant very clearly stated that he did not wish to voluntarily provide a sample and I think that the officer's statements rose to the level to make his then later provision of the breath test involuntary."
RR Vol. 1 Page 71.

The trial court thereafter entered its findings of fact and conclusions of law regarding this decision. CR Vol. 1 Pages 22 - 26. Therein the trial court made the following findings of fact:

"12. Following the Defendant's refusal to voluntarily provide a sample, Trooper Wilhite unequivocally informed the Defendant that he was going to obtain a mandatory specimen of blood.

"13.Only after being told that a mandatory specimen of his blood was going to be taken with or without his consent, with no mention of seeking a blood warrant first, the Defendant then informed the Trooper that he would provide a breath sample.

"15. No evidence of exigent circumstances was offered by the State, and Trooper Wilhite testified that he had no intention of attempting to obtain a blood warrant prior to subjecting the Defendant to a mandatory blood draw.

"16. The opinion of the United States Supreme Court in Missouri v. McNeely had been issued for more than one year at the time of the events of this case." CR. Vol. 1 Pages 24 - 25.

## Summary Of The Argument on Issue No. 1

**Does a trial court abuse its discretion in suppressing evidence of a breath sample and test results by holding that the Defendant's decision to give a breath sample, without considering the totality of the evidence, was involuntary on the basis of the mere mention of the trooper's intent to obtain a mandatory blood draw as opposed to obtaining a blood search warrant.**

The trial court's determination that the consent given by the Appellee to provide a sample of his breath was solely focused on the fact that when Appellee first refused the trooper's request for a breath sample, the trooper then told Appellee that the trooper would be taking Appellee to a facility to do a mandatory blood draw as opposed to obtaining a warrant to have a blood sample drawn. The trial court failed to take into consideration the totality of the circumstances surrounding the Appellee's decision to change his mind and consent to providing a sample of his breath and based its decision on the holding of a 1993 case opinion that was overruled by the Court of Criminal Appeals in 2012.

# Argument On Issue No. 1

## 1.1 Principals of Law

Before requesting a person to submit to the taking of a specimen, the officer shall inform the person orally and in writing that:

(1) if the person refuses to submit to the taking of the specimen, that refusal may be admissible in a subsequent prosecution;

(2) if the person refuses to submit to the taking of the specimen, the person's license to operate a motor vehicle will be automatically suspended, whether or not the person is subsequently prosecuted as a result of the arrest, for not less than 180 days;

(3) if the person refuses to submit to the taking of a specimen, the officer may apply for a warrant authorizing a specimen to be taken from the person;

(4) if the person is 21 years of age or older and submits to the taking of a specimen designated by the officer and an analysis of the specimen shows the person had an alcohol concentration of a level specified by Chapter 49, Penal Code, the person's license to operate a motor vehicle will be automatically suspended for not less than 90 days, whether or not the person is subsequently prosecuted as a result of the arrest;

(5) if the person is younger than 21 years of age and has any detectable amount of alcohol in the person's system, the person's license to operate a motor vehicle will be automatically suspended for not less than 60 days even if the person submits to the taking of the specimen, but that if the person submits to the taking of the specimen and an analysis of the specimen shows that the person had an alcohol concentration less than the level specified by Chapter 49, Penal Code, the person may be subject to criminal penalties less severe than those provided under that chapter;

(6)    if the officer determines that the person is a resident without a license to operate a motor vehicle in this state, the department will deny to the person the issuance of a license, whether or not the person is subsequently prosecuted as a result of the arrest, under the same conditions and for the same periods that would have applied to a revocation of the person's driver's license if the person had held a driver's license issued by this state; and

(7)    the person has a right to a hearing on the suspension or denial if, not later than the 15th day after the date on which the person receives the notice of suspension or denial or on which the person is considered to have received the notice by mail as provided by law, the department receives, at its headquarters in Austin, a written demand, including a facsimile transmission, or a request in another form prescribed by the department for the hearing.

Tex. Transp. Code § 724.015.

The circumstances that involve the taking of a sample of the breath or blood of a suspect are:

(a)    One or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person:

(1)  while intoxicated was operating a motor vehicle in a public place, or a watercraft; or

(2)  was in violation of Section 106.041, Alcoholic Beverage Code.

(b)    A peace officer shall require the taking of a specimen of the person's breath or blood under any of the following circumstances if the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft and the person refuses the officer's request to submit to the taking of a specimen voluntarily:

(1)  the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense and, at the time of the arrest, the officer reasonably believes that as a direct result of the accident:

   (A)  any individual has died or will die;

   (B)  an individual other than the person has suffered serious bodily injury; or

   ( C)  an individual other than the person has suffered bodily injury and been transported to a hospital or other medical facility for medical treatment;

(2)  the offense for which the officer arrests the person is an offense under Section 49.045, Penal Code; or

(3)  at the time of the arrest, the officer possesses or receives reliable information from a credible source that the person:

   (A)  has been previously convicted of or placed on community supervision for an offense under Section 49.045, 49.07, or 49.08, Penal Code, or an offense under the laws of another state containing elements substantially similar to the elements of an offense under those sections; or

   (B)  on two or more occasions, has been previously convicted of or placed on community supervision for an offense under Section 49.04, 49.05, 49.06, or 49.065, Penal Code, or an offense under the laws of another state containing elements substantially similar to the elements of an offense under those sections.

( c)  The peace officer shall designate the type of specimen to be taken.

(d)  In this section, "bodily injury" and "serious bodily injury" have the meanings assigned by Section 1.07, Penal Code.
Tex. Transp. Code § 724.012.

The provision regarding the offense of Driving While Intoxicated with Child Passenger is:

(a)    A person commits an offense if:

(1)    the person is intoxicated while operating a motor vehicle in a public place; and

(2)    the vehicle being operated by the person is occupied by a passenger who is younger than 15 years of age.

(b)    An offense under this section is a state jail felony.
Tex. Pen. Code § 49.045.

A trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). An appellate court will review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported in the record. *Id.*

When reviewing a trial court's ruling on a motion to suppress evidence, the reviewing court will give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

The reviewing court will consider de novo questions of law and "mixed questions of law and fact" that do not depend upon credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006).

On the issue of abuse of discretion, the reviewing court will sustain the trial judge's decision if it is correct on any theory of law applicable to the case. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000).

If the trial court's decision falls within the zone of reasonable disagreement, it will be upheld. See *Gonzalez v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007).

A driver's consent to a blood or breath test must be free and voluntary, and it must not be the result of physical or psychological pressures brought to bear by law enforcement. *Meekins v. State*, 340 S.W.3d 454, 458-59 (Tex. Crim. App. 2011).

The ultimate question is whether the person's "will has been overborne and his capacity for self-determination critically impaired" such that his consent to search must have been involuntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Meekins*, 340 S.W.3d at 459.

To determine the issue of whether the consent is voluntary the court must review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person. *Meekins*, 340 S.W.3d at 459.

The validity of an alleged consent is a question of fact, and the State must prove voluntary consent by clear and convincing evidence. *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011).

Critical to a consent analysis is that the fact finder must consider the totality of the circumstances in order to determine whether consent was given voluntarily. *Meekins*, 340 S.W.3d at 459 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006).

The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent to search was voluntary or coerced. *Meekins*, 340 S.W.3d at 459.

It follows that, because the fact finder must consider all of the evidence presented, no one statement or action should automatically amount to coercion such that consent is involuntary— it must be considered in the totality. *Fienen v. State*, 390 S.W.3d 328 (Tex. Crim. App. 2012).

Under the *Erdman* (*Erdman v. State*, 861 S.W.2d 890, 894 (Tex. Crim. App 1993)) holding, the Court simply assumed that the non-statutory language conveyed by the officer regarding the consequences of refusal, in this case being that if the defendant failed the test he would be placed in jail that night but if he passed he could go

14

home, "was of the type that would normally result in considerable psychological pressure." *Fienen v. State*, 390 S.W.3d at 334.

The *Erdman* Court's analysis focused entirely on that non-statutory language. In finding that there was no evidence that the non-statutory information, which was conveyed about the consequences of a refusal, actually had any real bearing on [the appellant's] decision to consent, the *Erdman* Court disregarded other evidence presented at the hearing on the motion to suppress. *Fienen v. State*, 390 S.W.3d at 334.

As a consequence of *Erdman* 's confused and flawed reasoning, its progeny has focused on whether the alleged extra-statutory warnings concerned the consequences of refusing to take the breath test. *Fienen v. State*, 390 S.W.3d at 334.

No statement— whether it refers to the consequences of refusing a breath test, the consequences of passing or failing a breath test, or otherwise— should be analyzed in isolation because its impact can only be understood when the surrounding circumstances are accounted for. Hence, non-statutory language does not automatically amount to coercion or create an inference thereof. *Fienen v. State*, 390 S.W.3d at 335.

"This Court (Court of Criminal Appeals) no longer finds the holding or the reasoning of *Erdman* persuasive." *Fienen v. State*, 390 S.W.3d at 334.

## 1.2   Applicable Facts

Appellee was originally arrested on April 11, 2014, and was charged with the offense of Driving While Intoxicated with Child Passenger.  RR Vol. 2 Pages 16, 28. On September 18, 2015, the trial court conducted a pre-trial hearing on Appellee's motion to suppress, among other things, the taking of Appellee's breath sample and the test results thereon.  RR Vol. 2 Page 1; CR Vol. 1 Pages 6 - 10.  The sole witness called at this hearing was DPS Trooper Mason Wilhite.  RR Vol. 2.  The sole exhibit admitted during this hearing was the on-board video recording of Trooper Wilhite's stop of Appellee, the subsequent investigation and arrest, all discussions regarding the trooper's request for a breath sample and the responses of Appellee, and the ultimate submission by Appellee of breath samples into the Intoxilizer 5000.  RR Vol. 3 State's Exhibit 1.

Trooper Wilhite's attention was drawn to Appellee when the trooper's radar unit detected Appellee's vehicle traveling 60 miles per hour in a 55 mile per hour zone. RR Vol. 2 Page 17; Vol. 3 State's Exhibit 1.   While following Appellee for a few moments Trooper Wilhite observed Appellee's vehicle cross over the fog line multiple times.  RR Vol. 2 Page 18; Vol. 3 State's Exhibit 1.   Trooper Wilhite then ran Appellee's license plate number through his on-board computer and got an

Alert. RR Vol. 2 Page 19. At this point Trooper Wilhite stopped Appellee. RR Vol. 2 Page 20; Vol. 3 State's Exhibit 1 - video counter 02:10.

Trooper Wilhite first directed Appellee to exit his vehicle and come to the rear of the truck to which Appellee complied. RR Vol. 3 State's Exhibit 1 - video counter 02:48 to 03:27. Trooper Wilhite explained the purpose of the stop and checked the VINs on the registration sticker and door plate following which Trooper Wilhite returned to his unit to determine if the vehicle was stolen. RR Vol. 3 State's Exhibit 1 - video counter 03:27 to 05:30.

After determining that the vehicle was not stolen and after identifying the child passengers, Trooper Wilhite began explaining to Appellee the reason for his concern about the truck being stolen. RR Vol. 3 State's Exhibit 1 - video counter 09:30. At this point Trooper Wilhite began asking about Appellee being a registered sex offender and whether he was allowed to have the minors with him. RRVol. 3 State's Exhibit 1 video counter 09:30 to 10:57. During this discussion Trooper Wilhite detected the odor of alcoholic beverage and inquired of Appellee how much he had to drink that night. RR Vol. 2 Page 22; Vol. 3 State's Exhibit 1 - video counter 10:57. Appellee responded that he had one beer three hours earlier. RR Vol. 2 Page 22; Vol. 3 State's Exhibit 1 - video counter 11:01. Trooper Wilhite stated that he was smelling it and Appellee stated it was a big beer. RR Vol. 2 Page 22; Vol. 3

State's Exhibit 1 - video counter 11:08. At this point Trooper Wilhite informed Appellee that he was going to check Appellee's eyes to see if Appellee was ok to drive and pointed to where the trooper wanted Appellee to stand. RR Vol. 3 State's Exhibit 1 - video counter 11:08 to 11:21. This was followed by the HGN test. RR Vol. 2 Page 24; Vol. 3 State's Exhibit 1 - video counter 11:21 to 12:48. Following the HGN test Trooper Wilhite asked Appellee if he was willing to blow in the PBT. RR Vol. 3 State's Exhibit 1 - video counter 12:50. Appellee declined to do this. RR Vol. 3 State's Exhibit 1 - video counter 13:03.

After some further discussion and the trooper repositioning his patrol car, Trooper Wilhite performed the HGN a second time following which the trooper began instructing Appellee on the Walk-and-Turn test. RR Vol. 2 Page 26; Vol. 3 State's Exhibit 1 - video counter 14:26 to 20:45. Trooper Wilhite then instructed and administered the One-Leg-Stand test. RR Vol. 2 Page 27; Vol. 3 State's Exhibit 1 - video counter 20:45 to 22:08. At the conclusion of these tests, Trooper Wilhite began instructing Appellee on how to blow into the PBT. RR Vol. 2 Page 27; Vol. 3 State's Exhibit 1 - video counter 23:10. Appellee again stated he did not want to do the PBT. Vol. 3 State's Exhibit 1 - video counter 23:15. After explaining to Appellee that the PBT test was not admissible in court, Appellee complied with the trooper's instructions. RR Vol. 2 Page 28, Vol. 3 State's

18

Exhibit 1 - video counter 23:15 to 25:40. The results were ".130". RR Vol. 2 Page 28. Trooper Wilhite placed Appellee under arrest for Driving While Intoxicated with Child Passenger. RR Vol. 2 Page 28, Vol. 3 State's Exhibit 1 - video counter 26:38.

Once Appellee was secured in the patrol car, Trooper Wilhite placed a copy of the DIC-24 form in front of Appellee and read the contents of the form to Appellee. RR Vol. 2 Pages 29 - 30; Vol. 3 State's Exhibit 1 - video counter 26:38 to 35:52. At this point Trooper Wilhite requested a breath sample. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1 - video counter 35:57. The first response of Appellee was to decline the request. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1 - video counter 36:27. After the refusal Trooper Wilhite explained to Appellee that the trooper was going to get a mandatory blood draw because Appellee had children in the vehicle making this a felony. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1 - video counter 36:27 to 36:50. Appellee then asked if getting breath was better. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1 - video counter 36:51. Trooper Wilhite responded that it was too late, that he could not make the decision for Appellee, and that Appellee has to make an informed decision. RR Vol. 2 Page 30; Vol. 3 State's Exhibit 1 - video counter 36:51 to 37:20. This conversation continued at which time Appellee stated he would give a breath sample. RR Vol. 2 Page 31; Vol. 3 State's Exhibit 1 - video counter 37:20

to 37:45. Appellee repeated this three times.    RR Vol. 2 Page 31; Vol. 3 State's Exhibit 1 - video counter 37:45 to 38:10.

While awaiting Appellee's wife to arrive to pick up the children and Appellee's truck, Appellee and Trooper Wilhite were off and on involved in general conversation.   Vol. 3 State's Exhibit 1 - video counter 38:10 to 1:07:25.   At a few points Appellee started chuckling during the conversation. Vol. 3 State's Exhibit 1 - video counter 48:24, 50:00, 53:24, 53:45, 58:15, 59:10, 1:00:38, 1:04:20.

Once Trooper Wilhite started en route to where the Intoxilizer 5000 was located, Appellee and Trooper Wilhite continued with general conversation. RR Vol. 2 Page 31; Vol. 3 State's Exhibit 1 - video counter 01:16:13 to 01:42:10.   Again, the conversation turned jovial at times.   RR Vol. 3 State's Exhibit 1 - video counter 01:19:45, 01:20:07, 01:21:33,   01:23:24, 01:25:41, 01:27:10, 01:32:56, 01:33:45, 01:40:06, 01:41:07.

Once at the location of the Intoxilizer 5000, Trooper Wilhite begins by explaining part of what he is doing as he is preparing the instrument for use. RR Vol. 3 State's Exhibit 1 - video counter 01:45:15.   Again, Appellee is jovial at times.   RR Vol. 3 State's Exhibit 1 - video counter 01:45:43, 01:47:45, 01:49:45, 01:51:08.   Once the instrument is warmed up and ready Trooper Wilhite explains that Appellee will not see the test result on the screen at which time Appellee states that he is ready to

blow. RR Vol. 3 State's Exhibit 1 - video counter 01:52:45 to 01:53:12. Once Appellee begins blowing Trooper Wilhite continues prompting Appellee to continue. RR Vol. 3 State's Exhibit 1 - video counter 01:53:12 to 01:53:32. Appellee stopped too soon on the first attempt and they began again. RR Vol. 3 State's Exhibit 1 - video counter 01:53:32 to 01:53:39. Appellee gave a proper sample on the second attempt. RR Vol. 3 State's Exhibit 1 - video counter 01:53:39 to 01:53:53. The instrument prepared itself for the second test sample at which time Appellee again provided a proper sample. RR Vol. 3 State's Exhibit 1 - video counter 01:53:53 to 01:56:12.

At no time during the transport from the scene of the stop to the location of the Intoxilizer 5000 did Appellee express that he had changed his mind about providing a breath sample. RR Vol. 2 Page 32. Upon arrival Appellee provided both of the requested samples without giving any indication that he did not wish to do so. RR Vol. 2 Pages 32 - 33.

### 1.3 Discussion and Conclusion

In this case the question to be considered is whether the trial court, in light most favorable to the trial court's ruling, committed an abuse of discretion when it determined that because Trooper Wilhite told Appellee that the trooper planned on

obtaining a mandatory blood draw instead of obtaining a blood search warrant, approximately one year after the *Missouri v. McNeely* decision was handed down by the United States Supreme Court, was sufficient by itself to render Appellee's subsequent decision to give a breath test involuntary. As will be shown, Appellant asserts that under these circumstances the answer is no.

The totality of the circumstances surrounding the police-citizen interaction here was available to the trial court by way of the testimony of Trooper Wilhite and by way of State's Exhibit 1, the on-board audio/video recording made by the trooper's recording device. While this Court does not have the ability to observe the nuances which can be detected by human senses during live testimony, this Court does have the full exhibit as well as the trial court's findings of fact and conclusions of law to consider.

A full review of the exhibit contained in the Reporter's Record Volume 3 fully supports the trial court's statements made at the conclusion of the hearing that Trooper Wilhite did not do anything intentionally wrong or that anything he said was necessarily not in line with what DPS policy was at the time. As shown in the exhibit, from the time of the initial contact with Appellee at the traffic stop to the time that the breath test process was concluded Trooper Wilhite, while being firm at times like when the trooper challenged Appellee's statement that he has only

22

drank one beer three hours earlier, was always polite and professional to Appellee. The trooper was patient with Appellee. For example, during the times when Appellee was not following instructions during the Standardized Field Sobriety Tests as well as the period when Appellee and the trooper were waiting for Appellee's wife to arrive to pick up the children and Appellee's pickup. Even when Appellee failed to provide an adequate breath sample on the first try at the Intoxilizer 5000, Trooper Wilhite professionally guided Appellee through the process to completion.

In considering Appellee himself, one will easily note that from start to finish Appellee was never under any undue physical or psychological distress. Appellee never argued with the trooper. While attempting to talk the trooper into releasing Appellee, Appellee never showed an appearance of being angry or crying. Trooper Wilhite even considered Appellee's comfort by moving his handcuffed hands from the back to the front, a move that could have posed a threat to the safety of the officer if Appellee had not demonstrated that he could be trusted. While one can say that toward the point of the actual breath testing, Appellee was in some physical distress due to the need to urinate, Appellee demonstrated throughout the entire period of contact with the trooper that Appellee had the mental capability to refuse

to provide the breath sample in retaliation for the trooper not allowing Appellee to urinate, yet Appellee simply chose to cooperate until the test was completed.

In looking at the conduct and statements of Appellee from start to finish one would note that Appellee was polite and reasonably cooperative in his interactions with Trooper Wilhite. Appellee demonstrated a sufficient knowledge of the system by describing to the trooper his prior arrest and prison sentence for a sexual type offense. Appellee, many times during the period of waiting for his wife to arrive and during the period of the drive to the Intoxilizer 5000, engaged Trooper Wilhite in general conversation, both asking the trooper about the trooper's time in the military and how his work schedule is set and by telling the trooper about Appellee's work and family life. Many points during these conversations led to a period of being jovial with Appellee chuckling. Appellee never stated or gave any indication that he was ill, afraid, or uncomfortable. In fact Appellee, at one point, indicated a matter-of-fact resolve that because of his past he would be doing a lot of time for this.

As the trial court noted Appellee did refuse the trooper's request for a breath sample following the reading of the DIC-24 form. Trooper Wilhite stated that because there were minors in the vehicle that this was a felony and because of this he was going to do a mandatory blood draw. Trooper Wilhite testified at the

suppression hearing that he was not going to obtain a blood search warrant at that point.

One thing to note here is that the tone of voice and surrounding conversation shows that Trooper Wilhite did not mention mandatory blood draw as any form of threat or coercion, and this by far did not rise to the level necessary for Appellee's will was overborne and his capacity for self-determination critically impaired. In fact, the first couple of times when Appellee stated he would give a breath sample, Trooper Wilhite stated that it was too late because Appellee had refused and that the trooper would have to get a blood search warrant. It was only after Appellee said he would give a sample multiple times that Trooper Wilhite acquiesced.

In the trial court's findings of fact, the trial court noted that this case occurred more than one year following the opinion of the United States Supreme Court in the case of *Missouri v. McNeely*, ___ U.S. ___, 133 S.Ct. 1552 (2013). Because the trial court noted this case in particular, it should be pointed out that the case on which *McNeely* was based was a simple Driving While Intoxicated and did not deal with any statutes similar to Tex. Transp. Code § 724.012. Following the announcement of the *McNeely* holding there has been a lot of debate in the appellate field as to whether *McNeely* would have any impact on § 724.012.

The only case this very Court has had which attempted to raise the impact of *McNeely* on § 724.012 was the case of *Sherry v. State*, a memorandum opinion under docket number 03-13-00126-CR that was handed down on August 16, 2013. In this case this Court held that the appellant had failed to preserve this point for appellate review and overruled the issue. The issue has still not been fully settled in Texas as the most recent case, *Douds v. State*, 2015 Tex. Crim. App. LEXIS 1060 being docketed as PD-0857-14 which was handed down on October 14, 2015, also held that the issue was not properly preserved for appellate review.

Yet even assuming that the provisions of § 724.012 can not override the protections of the Fourteenth Amendment, the mere mention of the mandatory blood draw can not, at least not yet, be considered a true misstatement of the consequences flowing from a refusal to give a specimen, as was concluded by the trial court in its Findings of Fact and Conclusions of Law. § 724.012 is still today "on the books" as far as the Court of Criminal Appeals is concerned.

But even this erroneous conclusion is not the final point of consideration. In its Findings of Fact and Conclusions of Law, the trial court clearly holds that by making this misstatement of the consequences flowing from a refusal to give a specimen, that act, and that act alone, rendered Appellee's subsequent decision to give a breath sample involuntary. The trial court pointed to no other factor, act of the trooper,

or condition of Appellee that, in conjunction with the misstatement, rose to the level that Appellee's will was overborne and his capacity for self-determination was critically impaired.

Of particular note, the trial court cites the holding of *Erdman v. State*, 861 S.W.2d 890 (Tex. Crim. App. 1993). Under this case the decision the trial court's holdings could be affirmed. However, the rule of law in *Erdman*, meaning that if a misstatement of the consequences flowing from a refusal to give a specimen is made, such misstatement renders a subsequent consent involuntary, was overruled by the Court of Criminal Appeals in 2012 in the case of *Fienen v. State*, 390 S.W.3d 328 (Tex. Crim. App. 2012). In overruling the *Erdman* holding, the Court held that because the fact finder must consider all of the evidence presented, no one statement or action should automatically amount to coercion such that consent is involuntary— it must be considered in the totality.

In the *Feinen* case, the Court of Criminal Appeals noted that upon the arrival of the investigating trooper as well as throughout the entire encounter with the defendant, the defendant conversed with the trooper comfortably and familiarly. *Fienen v. State*, 390 S.W.3d at 330. By viewing RR Vol. 3 State's Exhibit 1, the **exact** same statement can be made regarding Appellee's interaction with Trooper Wilhite. In *Feinen*, as in this case, the trooper read the DIC-24 form exactly and asked for a

sample of breath which request was refused. *Fienen v. State*, 390 S.W.3d at 330. Upon hearing the refusal from the defendant (in *Feinen*)/Appellee (in this case), the trooper informed the defendant (in *Feinen*)/Appellee (in this case) that the trooper was going to arrange for a blood specimen to be taken. *Fienen v. State*, 390 S.W.3d at 330. The only difference between the two cases regarding the trooper's statement is that in *Feinen* the trooper stated he was going to obtain a blood search warrant while in the present case the trooper was going to obtain a mandatory blood sample. In both cases, upon hearing that the trooper was planning to obtain blood from the defendant (in *Feinen*)/Appellee (in this case), the defendant (in *Feinen*)/Appellee (in this case) immediately offered to provide a breath specimen. The defendant in *Feinen* expressed a fear of needles while Appellee expressed he wanted to make it easier. In this case Appellee just asked if giving breath would be easier without clarifying whether he meant if it would be easier on himself or easier for the trooper. While the trial court focused simply on the trial court's belief that the *McNeely* decision banned mandatory blood draws under § 724.012, there is no evidence that Appellee had any appreciation that a mandatory blood draw may have been unlawful. Based on the evidence in the record it is most likely that Appellee would have responded in the same way if Trooper Wilhite had announced his plan to obtain a blood search warrant.

In conclusion, considering the totality of the circumstances surrounding the police-citizen encounter in this case, from the point of view of the objectively reasonable person, it can not be said that this decision by the trial court would fall within a reasonable zone of disagreement but instead is an abuse of discretion.

For these reasons the Order on Defendant's Motion to Suppress must be reversed and the case remanded to the trial court to continue to trial with the evidence of the breath test and results thereof available to the State of Texas.

# PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellee prays the Court reverse

the Order on Defendant's Motion to Suppress entered on September 28, 2015.

Respectfully submitted,

OFFICE OF DISTRICT ATTORNEY
33RD and 424th JUDICIAL DISTRICTS
Wiley B. McAfee, District Attorney
P. O. Box 725
Llano, Texas 78643
Telephone          Telecopier
(325) 247-5755     (325) 247-5274

By: _____
    Wiley B. McAfee
    District Attorney
    State Bar No. 13318020
    w.mcafee@co.llano.tx.us

By: _____
    Gary W. Bunyard
    Assistant District Attorney
    State Bar No. 03353500
    g.bunyard@co.llano.tx.us

ATTORNEYS FOR APPELLEE

## CERTIFICATE OF WORD COUNT

This is to certify that the pertinent portion of this brief contains 5,989 words printed in Aldine401BT 14 font, according to the WordPerfect™ X7 word count tool.

_____
Gary W. Bunyard

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the above and foregoing instrument, together with this proof of service hereof, has been forwarded on the 2nd day of December 2015, to Ray Thomas Bass III, Attorney for Appellee, by email and by EServe.

_____
Gary W. Bunyard
Assistant District Attorney