

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00477-CR

———————————————

FRANKLIN THOMAS CARROLL, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CR16-0091

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

In three points, Appellant Franklin Thomas Carroll appeals his conviction for indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11(a)(1). We affirm the trial court's judgment.

**Background**

In 2015, School Resource Officer (SRO) and Springtown Police Officer Becky Lacroix was cleaning out a desk at Springtown High School when she found a sexually suggestive letter that appeared to have been written by a female student to Carroll, who had been the Springtown SRO before Lacroix. Upon further investigation, law enforcement determined that Anna[1] had written the letter to Carroll when she was a freshman at Springtown and that Anna alleged Carroll had touched her inappropriately while she was a freshman and he was the SRO. Carroll was eventually charged with indecency with a child by contact, and the case proceeded to trial in October 2018.

**I. Anna's testimony at trial**

Anna, who was 19 at the time of trial, testified that she met Carroll when she got into trouble in middle school, first for an incident involving sexually explicit letters she wrote to another male student and a second time for bringing alcohol to school. Carroll, who oversaw all Springtown public schools as SRO, wrote Anna a

---

[1]We refer to the complainants by aliases in an attempt to protect their privacy. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

citation for possessing alcohol as a minor, and Anna had to do community service as a result. Shortly after the alcohol incident, Anna spent time in an Arlington mental-health hospital and finished that school year at a different school. While in the mental-health hospital, Anna wrote on a worksheet that Carroll caused her "stress" and that she considered him an "external threat," but at trial she could not remember why she had written down his name. She guessed that Carroll "probably had made [her] uncomfortable" because he "seem[ed] creepy to [her]."

When Anna returned to Springtown High for her freshman year, she sought out Carroll's help to obtain a pregnancy test based on another student's recommendation that Carroll was "really cool" and probably would not tell faculty or her parents. According to Anna, Carroll did obtain a pregnancy test for her, and after that, the pair developed a relationship. Anna described how Carroll would check up on her and would call her into his office through the school intercom, by text message, or in person whenever he saw her in the school hallways. Anna described meeting with Carroll in his office—always with the door closed, at his request—and confiding in Carroll about her "emotional life," such as boyfriend issues.

Anna testified that the relationship escalated: "[A]fter a few visits to his office, one time, after we got done talking and just, you know, hanging out, getting to talk, he got up to walk me out of the room like he would every time and he kissed me." She described the kiss as a "peck" on the lips, and that she was "just kind of in shock" afterward. According to Anna, they continued hugging and kissing at the end of their

3

meetings for a "couple of weeks" and these meetings occurred "[m]aybe three to four times a week" and for about 10 to 15 minutes at a time. Eventually, "one time after the hugging and kissing had been going on for a while, he got up and . . . was walking [her] out of the room as usual and he grabbed [her] breast" over her clothes. Anna testified that she did not report the inappropriate touching and kept returning to his office because, as she put it, "I don't know how to say no whenever it's someone in authority." According to her, the over-the-clothes groping of her breast happened "multiple times," and after "maybe a month" he started touching her breasts underneath her clothes and squeezing them for a few seconds at a time. Anna testified that "once or twice" he "put his hand down [her] pants and just in between [her] skin and [her] underwear and just briefly touched [her genitalia]." She testified that her reaction was, "[l]ike all the other times, it's a shock and just 'why?'"

Anna did not tell anyone about Carroll's inappropriate advances until December 2015 when confronted with the letter found by Officer Lacroix. In an interview with Lacroix and Investigator Angela Jay, Anna admitted that she had written the letter to Carroll upon his request. As she testified at trial, when Carroll found a similar sexually explicit letter that Anna had written a male classmate—which, according to Anna, contained descriptions of sexually explicit activity that had not actually occurred—Carroll asked her, "Why don't you write me stuff like this?" Anna testified that Carroll also asked her if she would perform oral sex on him or touch him.

4

By the time she started her sophomore year, Anna stopped going to Carroll's office and avoided him by telling him that she "was busy and trying to focus on school."

## II. Rule 404(b) testimony

During the trial, the State sought to present testimony by two additional female former students of Springtown, Gina and Heather, and one teacher, Terri Massey. After a hearing, the trial court ruled that the three witnesses would be permitted to testify.

### A. Gina's testimony

Gina was Anna's classmate who also met Carroll when she was in middle school. Gina and Carroll developed a friendship, complete with their own secret handshake. When she moved on to high school, she continued talking to and confiding in Carroll during closed-door meetings in his office, which sometimes took place "multiple times a day" and lasted between five to twenty minutes. According to Gina, Carroll often complimented her, and one time when she was tired, he told her that she could take naps on the couch in his office. Gina described the offer to sleep in his office during the school day as "weird [and] uncomfortable."

Eventually, the meetings began to get in the way of her schooling. She told the jury that "[s]ometimes it would get to be too much. . . . When it became more frequent, then sometimes I would have to leave because I would be in the middle of a test or actually trying to learn something." And at some point, Carroll started to give

her a side hug when she left his office.  Gina testified that Carroll's compliments began to escalate, and she described an instance when he allegedly commented on how good she looked wearing Spandex, and she described another time when he said she could always change clothes in his office if needed.  Then came the "unexpected" touching.  Gina described a time when he held her hand unexpectedly when showing her how to check her pulse, making her feel "awkward" and "uncomfortable."

Finally, according to Gina, the inappropriate advances culminated during her sophomore year when he "French kiss[ed]" her:

> [H]e started telling me that if he would ever have - - he would have an affair like with his wife with me[2] and things became really personal and he - - I was becoming really uncomfortable and I asked to leave.  And whenever I left, he asked me if I - - if he could give me a hug.  And he did.  And when I went to leave, he grabbed my neck and grabbed my face and kissed me forcefully.  And then I left.

Gina testified that this incident triggered a panic attack in class afterwards that resulted in Massey's taking her to the school counselor and the school nurse.  According to Gina, sometime later that day, Carroll came to find her in class and told her, "I don't want this to ruin our friendship."  He asked her for another hug, Gina obliged, they hugged, she returned to class, and she never went back to Carroll's office again.

---

[2]Later in her testimony, she stated that the affair conversation occurred on a different day than the kiss.

Eventually, Gina confided in Anna about the incident. At trial, Gina testified that the idea of reporting these incidents to authorities was "terrifying" until Carroll left his position as SRO.

**B. Massey's testimony**

Massey testified that she had developed a close relationship with Gina when Gina was a high-school sophomore and that Gina often confided in her. She recounted one morning when Gina returned to Massey's class from the counselor's office and appeared upset and was crying and shaking in class but did not want to talk about it. When Massey offered to take Gina back to the counselor, Gina declined. Massey said that Gina was quieter after that incident, and she was not talking to her friends as much as usual. When she attempted to talk to Gina about it again, Gina again declined. According to Massey, Gina did not report the incident with Carroll to her until the next year.

**C. Heather's testimony**

Heather was older than Anna and Gina. She attended Springtown High for her senior year in 2012, when she was 17 years old. Heather testified that she met Carroll about a month before her senior year began, when she filed a police report against her stepfather "for holding [her] down." So when Heather started school and saw Carroll, she recognized him and began talking to him, and then she started going to his office at least two or three times a week. She testified that she revealed to him that she had been involved in a relationship with a teacher at the high school. After

7

that revelation, the "dynamic changed" such that Heather "could tell that he was going to use that [against her]." About a week later, Carroll sent her a text message asking that she send nude pictures of herself to him. Despite her reservations, she sent him ten or so nude photos of herself, responding to his requests for "certain poses, certain body parts." According to Heather, he also requested videos, but she lied and told him that her phone could not record videos. After sending him the nude photos, she continued communicating with Carroll, but soon she dropped out of school. According to Heather, their final interaction was a 30-minute meeting at a park, where Carroll asked her to show him her breasts but she "kind of made it into a joke" and left.

## III. Carroll's defense witnesses

### A. Rhonda Ribble

Rhonda Ribble was the assistant principal of the middle school when Anna got in trouble for writing sexually explicit letters to a male classmate. She described a meeting between her, Carroll, and Anna in which Carroll "chewed [Anna] out" for her behavior. Ribble testified, "It was a royal chewing out. It was actually really hurtful, I felt like, toward the girl. You know, I've listened to Officer Carroll chew out a lot of kids, and it was what they did, but it wasn't so personal as it was in this situation probably." She labeled Carroll's language as "emotionally . . . belittling," "humiliating," "over the top," and "excessive." According to Ribble, Anna initially

reacted by crying, but then she "just kind of stiffened up and was just looking straight ahead."

## B. Dr. Alexandria Doyle

Carroll called Dr. Alexandria Doyle, a licensed clinical psychologist whose practice included forensic psychology, to testify in his defense. Dr. Doyle testified that she reviewed Anna's medical records from the mental-health hospital, therapy records from a separate counseling facility, a recording of "her initial interview," CPS reports, and school records. According to Dr. Doyle, Anna had been diagnosed in the eighth grade with major depressive disorder, global anxiety or general anxiety disorder, and borderline personality tendencies. She described a person with "borderline personality tendencies" as having a more "expressively dramatic" personality "characterized by mood problems and problems seeing things clearly or seeing things the way other people do." Dr. Doyle testified that details of Anna's medical records justified that diagnosis, including that Anna had "a lot of relationship problems," "premature sexual activity," and "boundary problems," and that she got "too involved and then ha[d] fights with [people]."

Dr. Doyle characterized Anna's sexually explicit letters as consistent with her diagnosis of borderline personality disorder, because such a diagnosis "often involves problems with . . . sexually excessive behavior." Regarding Anna's sexually explicit letter to Carroll, Dr. Doyle opined that Anna was acting out her impulses to be in a

relationship with Carroll through a "seductive, kind of in-your-face letter to him, really a provocative letter." She testified that the letter was a "fantasy."

Dr. Doyle also hypothesized that Anna might not have remembered the very tense meeting described by Ribble because Anna might have "blocked it out because it was so unpleasant, it was so painful." She also testified that, in addition to memory suppression, a person with borderline personality traits may also experience "memory confabulation," in which memories of experiences become altered—"So if . . . somebody says something to you that sounds like a good aspect of it, you may incorporate that into your story because you're so impressionable and it's suggestive."

### C. Carroll

Carroll elected to testify in his own defense. Carroll explained that he often met with students in his office as part of his role as SRO. Carroll recalled meeting Anna when she was in middle school and he was called in to meet with Anna and Ribble about the sexually explicit letters Anna had written to a classmate. Carroll testified that he was "firm" when he began talking to Anna, but when he perceived that Anna was not responding he became "more direct and more verbal." He agreed with Ribble's description and that his demeanor and language could have been perceived as humiliating and embarrassing for Anna.

Carroll admitted that Anna came to his office frequently and that they discussed some of Anna's personal issues, including her parents' divorce and "extremely a lot about her boyfriend." He alleged that Anna generally initiated their

contact, testifying that "[T]here [were] times where she would request for me to call for her, for which might be once every three to four weeks, to where she would want to come into the office a couple of times a week." Carroll adamantly denied ever buying Anna a pregnancy test, asking her to write the sexually explicit letter addressed to him, or having any inappropriate contact with or kissing her. According to Carroll, he found the sexually explicit letter sitting on his desk one day, but he never confronted Anna about it because he thought such a confrontation might "set her back" when she had progressed so far since the eighth-grade incident. Carroll told the jury that, sometime after that, another student informed him that Anna "had the hots for [him]" and "wanted to be with [him]," so he "kept his distance from [Anna]." He did not report the letter or Anna's alleged crush to anyone.

Similarly, when asked about Gina, Carroll denied any inappropriate contact, and he denied ever propositioning her for a sexual affair.

As for Heather, Carroll explained that he met her when he was on patrol and had been dispatched to a local park in response to a report of a woman sleeping in a truck. Carroll testified that Heather appeared to be living in her truck at the time, so he provided her with a contact for a local women's shelter and assisted her in making a police report about her father. Later, Carroll heard rumors that Heather was involved in a relationship with another school employee, and he informed the principal of those rumors. He testified that he also told Heather that he had heard the rumor but that Heather denied any such relationship. And when he confronted her

11

about the rumor a second time in the presence of the principal, she again denied it. He testified that, apart from seeing her in the hallway from time to time, the meeting with the principal was the last time he ever spoke to Heather. Carroll denied ever attempting to blackmail Heather by asking her for nude pictures of herself or having any inappropriate contact with her.

## IV. The jury's verdict

The jury found Carroll guilty of indecency with a child by contact and assessed a 12-year sentence. The trial court entered judgment and sentenced Carroll accordingly.

## Discussion

Carroll brings three points on appeal. He complains in his first two points of the trial court's decision to allow Gina, Massey, and Heather to testify, and in his third point he argues that the trial court erred by denying his motion to transfer venue.

## I. Admissibility of Gina's, Massey's, and Heather's testimony

Carroll challenged the admissibility of Gina's, Massey's, and Heather's testimony on two grounds: as improper extraneous-offense evidence and as unfairly prejudicial. *See* Tex. R. Evid. 403, 404(b). In recognition of the trial court's superior position to gauge the impact of evidence, we will reverse its decision on the admissibility of evidence "rarely and only after a clear abuse of discretion." *Lumsden v. State*, 564 S.W.3d 858, 877 (Tex. App.—Fort Worth 2018, pet. ref'd), *cert. denied*, 139 S. Ct. 2018 (2019).

12

### A. Rule 404(b)

Rule 404(b)(2) allows the use of extraneous-offense evidence for purposes other than to show character conformity. Tex. R. Evid. 404(b)(2). The rule lists as examples of other purposes: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* In addition, the court of criminal appeals has held that extraneous-offense evidence may be admissible to rebut a defensive theory such as fabrication. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). The State relies upon *Bass* in arguing that Gina's, Massey's, and Heather's testimony was admissible to rebut Carroll's theory of fabrication. We agree with the State.

Carroll's defense team presented a theory that Anna fabricated her allegations to get back at Carroll for rebuking her when she was caught writing sexually explicit letters in middle school and citing her for possessing alcohol in eighth grade. In defense counsel's opening argument, he laid a foundation for their fabrication defense by characterizing Carroll's citation of Anna for minor in possession of alcohol as causing her removal from school and her mental-health hospitalization. Defense counsel then emphasized that Anna was "a very troubled teenager [who] was wrestling with many issues" and described the sexually explicit letter to Carroll as "a continuation of similar activity that she had had in the 8th grade and was one way of her dealing with many of the problems that she faced at the time." Counsel also emphasized the changing nature of Anna's story and its inconsistencies.

13

During its cross-examination of Anna, the defense continued to establish the fabrication defense. First, counsel emphasized that Anna's sexually explicit letter was just a "fantasy," at one point arguing to the trial court that "the motive is, is that none of this is meant to be real, but there is a motive not to be credible and not to tell the truth. She's going - - she's angry at my client." Then, the defense offered records from the mental-health hospital and elicited testimony from Anna herself that she was interested in or attracted to girls. Carroll's counsel argued, "The fact, if proven, there's an attraction to girls. . . . Well, it undermines the legitimacy of these statements that they are - - that she's writing to boys at the same time. And there's a clear contradiction, Your Honor." The defense argued that her sexual orientation was relevant because it "would clearly go to credibility." The trial court allowed the questioning and admitted the evidence.

In one particular line of questioning, defense counsel painted a picture of petty revenge:

> Q. Officer Carroll had caused you stress in your life before 9th grade, right?
>
> A. Apparently so, according to [records from the mental-health hospital], yes, sir.
>
> Q. You held a grudge against him, right?
>
> A. I don't think so, no.
>
> Q. [Anna], this never happened, did it? He never touched you inappropriately, did he?
>
> A. Yes, he did.

14

. . . .

Q. When he had you in his office, he was telling you about the alcohol. Did you feel he was judging you?

A. No.

Q. He wrote you a ticket, right?

. . . .

A. Correct.

Q. And you ended up getting taken out of school in part because of that, right?

A. Correct.

Q. So with all those reasons there, you would have had a reason to make up a story about him, right?

A. There would have been a reason to, but that's not something I would have done, no.

Q. But you admit that would have given you a reason, right?

A. To any normal reason, yes, correct, that would be a reason for somebody to hold a grudge against somebody.

. . . .

Q. All of those reasons I gave you, your having bad vibes with him, him admonishing you in his office, his writing you a ticket for the alcohol, you being withdrawn from school because of that incident, those all were reasons - - those were all - - could be reasons for making up a story about him, right?

A. Potentially for somebody else, yes.

Q. Now, did you come up with this story on your own?

A. I did not come up with the story.

15

After the State rested, Carroll's team called Rhonda Ribble to testify to Carroll's "royal chewing out" of Anna in eighth grade, which she characterized as "really hurtful," "emotionally . . . belittling," "humiliating," "over the top," and "excessive." This depiction strengthened Carroll's attempts to frame Anna's allegations as retaliation. And finally, Carroll's team called Dr. Doyle, who testified to Anna's mental-illness diagnoses and surmised that Anna may have experienced "memory confabulation," resulting in Anna's creation of memories of inappropriate advances by Carroll.

We find this situation similar to that presented in *Bass*. In that case, the State's case against former pastor Bass of indecency with a child rested on the complainant's testimony to his molestation of her on church property and on extraneous-offense evidence that Bass molested two other girls on church property. *Id.* at 557. Bass's defense team promulgated a fabrication theory from the start, arguing in his opening statement that the complainant's allegations were "pure fantasy" and "pure fabrication" and that the allegations were contrary to Bass's character and "not worthy of belief." *Id.* Bass's counsel also attacked the complainant's credibility on cross-examination by emphasizing that the complainant's family did not believe her accusations and that the complainant waited a decade to report the abuse to police. *Id.* at 558. In closing argument, Bass's defense counsel claimed that "the State propped up the untrustworthy complainant's 'bizarre, silly accusation' against [Bass]

16

with the extraneous-offense evidence" and criticized the complainant's reputation as "not good." *Id.* at 560.

In holding that the extraneous-offense testimony was properly admitted by the trial court, the court of criminal appeals agreed with the State's argument that

> [i]t seems obvious that, if the State can show that a defendant has committed similar sexual assaults against unrelated and unconnected children, an affirmative defense allegation that the victim of the charged offense fabricated her claims is less likely to be true. By showing that the victim's allegations are less likely to be fabricated, the evidence directly rebuts the defensive claims and has logical relevance aside from character conformity.

*Id.* at 562–63.

Like Bass, Carroll opened the door to extraneous-offense testimony from Gina and Heather—and that of Terri Massey to the extent it corroborated Gina's testimony—by presenting a fabrication defense. *See id.* at 563 n.7 (noting that the State may reasonably rely on the defensive opening statement as to what evidence the defense intends to present and rebut this anticipated defensive evidence during its case-in-chief). Gina's and Heather's testimony suggested that Carroll had developed a practice of befriending troubled teen girls and then making inappropriate advances toward them, thereby lending credibility to Anna's testimony. *See id.* at 562–63; *Daggett v. State*, 187 S.W.3d 444, 453–54 (Tex. Crim. App. 2005) (holding in child-sexual-assault prosecution that defendant's direct-examination testimony disavowing any sexual misconduct with minors opened the door to admission of rebuttal extraneous-offense evidence of defendant's sexual misconduct with another

17

minor); *Powell v. State*, 63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001) (holding in indecency-with-a-child prosecution that defendant's opening statement that he lacked the opportunity to molest the complainant opened the door to rebuttal extraneous-offense evidence that defendant had molested others under almost identical circumstances). The trial court did not abuse its discretion by allowing the testimony of Gina, Massey, and Heather to rebut the fabrication defense. We therefore overrule Carroll's first point.

### B. Rule 403

In his second point, Carroll argues that the trial court erred by allowing the testimony of Gina, Massey, and Heather because any probative value was substantially outweighed by the testimonies' unfairly prejudicial impact. *See* Tex. R. Evid. 403.

Rule 403 allows a trial court to exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. *Id.* Admission of relevant evidence is favored, and we therefore presume that relevant evidence will be more probative than prejudicial. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). Evidence that is unfairly prejudicial has an undue tendency to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000).

When a rule 403 objection is made, the trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need

18

for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

We have already explained the relevance of the extraneous-offense testimony to undermining Carroll's fabrication defense. Gina's and Heather's testimony lent support to Anna's description of Carroll's efforts to build a relationship with Anna and then inappropriately take advantage of that relationship. The State's need for the testimony is apparent. Without the extraneous-offense testimony, the State had little to counter Carroll's assertions that Anna was a troubled teen girl who had made up allegations of sexual contact to retaliate against him for receiving a stern, perhaps abusive, lecture and a citation for minor in possession of alcohol. The State had no physical evidence of Carroll's groping and kissing of Anna. But with the aid of Gina's and Heather's testimony, the State was able to show that Carroll had the opportunity to abuse and a history of abusing his position of power within the high school to take advantage of teen girls. The trial court therefore did not abuse its discretion by determining that these factors weighed in favor of admitting the testimony.

19

While we do not ignore the inherently inflammatory nature of allegations of sexual misconduct involving children, and we recognize that the testimony of Gina, Massey, and Heather, was likely indelible, s*ee Montgomery v. State*, 810 S.W.2d 372, 397 (Tex. Crim. App. 1990) (op. on reh'g), we disagree with Carroll's assertion that the testimony influenced the jury in an irrational way. The trial court included a proper limiting instruction in the jury charge,[3] and without evidence otherwise, we presume the jury followed the instructions of the trial court. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). We therefore view this factor as also weighing in favor of admitting the testimony.

The State's examination of the extraneous-offense witnesses constituted just over a third of its case-in-chief. This factor weighs against admission of the testimony, but it does not eclipse the other factors we have already determined weighed in favor of its admission.

---

[3]The limiting instruction read as follows:

You are instructed if there is any testimony before you in this case regarding the Defendant's committing offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the state of the mind of the Defendant and the child and the previous and subsequent relationship between the Defendant and the child or in determining the motive, opportunity, intent, knowledge, absence of mistake or lack of accident of the Defendant, if any, in connection with the offenses, if any, alleged against him in the indictment in this case.

We hold that the trial court acted within its discretion by denying Carroll's Rule 403 objection to the testimony of Gina, Massey, and Heather. We overrule Carroll's second point.

## II. Motion to transfer venue

In his third and final point, Carroll argues that the trial court erred by denying his motion to transfer venue. We review the trial court's decision to deny the motion for an abuse of discretion and will uphold the decision so long as it falls within the zone of reasonable disagreement. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). To justify a change of venue based on media attention, a defendant must show that the publicity was "pervasive, prejudicial, and inflammatory." *Id.* Widespread publicity is not considered inherently prejudicial—even extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage. *Id.* "The mere existence of media attention or publicity is not enough, by itself, to merit a change of venue." *Id.*

Ordinarily, we consider the voir dire record in a case where venue was challenged on pervasive-publicity grounds, but the voir dire in this case is not part of the record before us. *See id.* at 449. We will therefore consider the motion and hearing, which were filed and decided more than two years before trial.[4] Carroll urged

---

[4]The motion was filed and heard in July 2016; the trial was held in late October 2018.

that he could not receive a fair trial in Parker County "due to multiple articles written in local papers and on local social media sites such as Facebook" and a letter written to parents of Springtown ISD students.

At trial, Carroll offered and the trial court admitted six local newspaper articles discussing the allegations against Carroll—including that people had complained of his sexually inappropriate behavior prior to his work within the school district—and a letter sent to parents of Springtown ISD students addressing the allegations. Carroll called his sister-in-law as a witness, and she testified to her opinion that he would not receive a fair trial in Parker County because of the publicity surrounding the case. He also called a Springtown High School teacher, who testified that the letter sent home to parents was a topic of discussion around the campus.

The State offered four affidavits in which Parker County residents attested to their lack of any knowledge of Carroll or the allegations against him. And the trial court took judicial notice that Parker County included at least two school districts in addition to Springtown ISD and had an approximate population of 125,000.

On this record, Carroll did not meet his burden to establish "pervasive, prejudicial, and inflammatory" publicity. At most, he established the existence of some media attention two years prior to the trial. *See id.* at 459. Nor did he establish that any of the news reports were inaccurate and thereby prejudicial. *See id.* at 451. ("News stories, be it from print, radio, or television, that are accurate and objective in their coverage, are generally considered by this Court not to be prejudicial or

22

inflammatory."). We hold that the trial court did not abuse its discretion by denying

Carroll's motion to transfer venue, and we overrule his third point.

## Conclusion

Having overruled each of Carroll's three points, we affirm the trial court's

judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 27, 2020